**V.S. and H.S., Appellants,**

v.

**COMMONWEALTH of Kentucky, CABI-NET FOR HUMAN RESOURCES, and B.S., B.S., L.H.S., A.S., L.S., and B.S., Appellees.**

**E.S., Appellant,**

v.

**COMMONWEALTH of Kentucky, CABI-NET FOR HUMAN RESOURCES, and P.H.S., Appellees.**

Court of Appeals of Kentucky.

March 21, 1986.

Edward Dove, Madisonville, Dale Prince, Johnson & Prince, Elkton, for appellants.

Susan McBeath, Office of Counsel, Cabinet for Human Resources, Frankfort, Harold Johns, Dillingham & Johns, Elkton, for appellees.

Before CLAYTON, DUNN and McDONALD, JJ.

McDONALD, Judge:

This case involves two actions for termination of parental rights which were consolidated for trial purposes. The Cabinet for Human Resources (CHR) seeks to remove the children and terminate the parental relationship of H.S. and V.S. with their six infant children and the parental relationship of their daughter, E.S., with her son, P.H.S. In all, H.S. and V.S. had 11 children.

The facts show a continuing pattern of neglect by the parents of these remaining seven children. Beginning in 1977, CHR made contact with this family in Muhlenberg County. Thereafter, CHR supplied a vital and continuing stream of social services such as homemaking, food, clothing, utility payments, medical services, and family planning. The aid was necessary to alleviate critical situations and to bring about self-support and family efficiency. To the date of the trial there has been no substantial evidence of the slightest improvement or even interest in improvement by this family. Because these cases are of such grave consequence and affect so seriously the lives of many, we will give a detailed analysis of the evidence and issues before this court.

*Housing.* This family has lived in four different locations during the period preceding the temporary custody order entered. They presently live in a very small trailer as squatters. They have no lease or contract to pay rent. They acquired their present housing under the guise of a tem-

porary stay when the family moved upon Curtis Boley's property and they have remained there since under his charity and sufferance.

Their first dwelling was a trailer in Muhlenberg County which was repossessed. They then moved to two locations in Logan County in rapid succession, ultimately establishing their home in a dilapidated farmhouse that was open to the weather, without running water or toilets, and was heated only by an old fireplace with a broken chimney. They made no attempt to remove or repair that structure while they occupied it and, in fact, had the utilities cut off shortly before the children were removed under a petition for neglect.

Their present home is a trailer, 8' × 26', which was formerly occupied by one person. A view of the exhibits show it's more accommodating for chickens than for human beings. There is no substance or reality to the hope expressed by them that they will add to their present living structure. This fact is denied by the landowner upon whose land they are squatting. Their home, wherever it has existed, has always been grossly inadequate in size. The family is subjected to the elements of weather and vermin. Only after the family was reduced in size from three adults and seven children to three adults has there been any improvement in the cleanliness of their living quarters.

*Food/Hunger.* The children eat hungrily when fed by neighbors or by personnel at the schools. At first they were fed breakfast and lunch at school by volunteering teachers, and then later as part of the school food program. The children have been observed retrieving food discarded by their classmates from garbage cans, and consuming it. On the other hand, the facts show no accounting of the use of hundreds of dollars per month in food stamps, welfare funds, and multiple donations from private sources. The conclusion is inescapable that the funds and donations were used for things other than the family's basic needs for which they were intended,

all to the children's detriment and deprivation.

*Personal Hygiene.* The children were always seen filthy dirty. The feet were black, their necks ringed with ground-in dirt, hair matted and unwashed. Their condition was so bad that it took several baths to scrub away the filth following their removal from their parents' home.

*Clothes.* The children's clothes were inadequate despite an avalanche of donations. They did not have proper shoes or coats for winter and, in fact, arrived at school without these articles repeatedly. The school had to keep alternate clothes for them. The clothes they did wear were dirty and unrepaired. P.H.S. was observed wearing diapers which obviously had not been changed for long periods of time.

*Medical Circumstances.* These children were obviously ill and observed to be carrying untreated and infected wounds and cuts. The infant, P.H.S., is totally deaf but this fact was not discovered until he was removed from his mother and she was told. This child did not receive any special training to enable him to learn the language skills necessary for the human thinking process. At 34 months of age he knew two words. Two children were found to have scabies which were treated only at the insistence of the state welfare agency.

The children are mentally retarded but have received no special training for that condition by the parents.

*Sleeping Conditions.* The children habitually slept in crowded conditions with unchanged linens. The parents had their own spaces but the children, for example, were forced to sleep several to a couch or bed.

*Physical Abuse.* There was no evidence of unreasonable physical punishment or abuse, although the children were extremely withdrawn and unresponsive to teachers, classmates, and neighbors.

*Sexual Abuse.* There is hearsay testimony that H.S. sexually abused his older daughter. The same quality of testimony accuses H.S. of attempting to have sexual

relationships with two of his daughters presently removed. H.S. has denied these allegations. Rightfully, the trial court made no finding of sexual abuse in this regard and we do not detect any influence of this inadmissible evidence upon the trial court. There is psychological testimony that these two daughters have a fear of men now, especially of their father. The two children mimicked adult sexual acts while in their foster homes.

*Maternal Influences.* V.S. does not demonstrate adequate parenting skills necessary to meet the needs of her children. She does not apply herself to CHR's offer to train her. While she claims to love her children she does not show continuous interest in them, does not watch over them or provide for them.

E.S. is a very young mother without skills or education. She has refused to seek state assistance suggested to her for the reason that she wants to raise her son by herself. However, she has no personal resources to follow through with her desires.

*Paternal Influence.* Other than objecting to having his rights terminated, H.S. displays hardly any other interest in his children. He is a very infrequently employed farmhand who has no skills beyond raising and harvesting tobacco. In 1983 he earned $800 and was satisfied that he was thereby gainfully employed. Since his arrival at the Boley farm he has worked occasionally as a day laborer for the landowner. When jobs are obtained for him he will leave them. For example, his excuse for leaving a job will be that the lunch break is not long enough, or he will have some other synthetic excuse to quit.

*The Removal of the Children.* The parents knew why their children were temporarily removed from their custody. They were aware of the treatment plans worked out with CHR to unite their family. The plan required the parents to find suitable housing, keep it clean, find steady employment, and acquire parenting skills. They refused and failed to meet these requirements as planned. They demonstrated ef-

forts to comply only at a time just prior to the trial of the case. It is overwhelmingly obvious the parents wanted all of the welfare benefits they could muster but none of the responsibilities attendant with the benefits.

*The Foster Homes.* Since the removal of the children to foster homes they demonstrate great improvement. They are learning personal hygiene and grooming skills, and how to complete household chores. Former habits such as sexual mimicking and playing with their own excrement have ceased. The children now are outgoing in personality and improving in school within the limits of their abilities. The children love their parents but the difference between their former home and their foster homes is noticed by a remark from one of them, "I live in a real house now."

The testimony before the trial court has produced a voluminous record for review, and with that in mind, we will discuss the many allegations of error subscribed to the trial court.

The appellants' first assignment of error attacks the sufficiency of evidence before the trial court upon which the termination of parental rights would be proper. It is contended that the Cabinet failed in its burden of proof by clear and convincing evidence that the infant, P.H.S., has been abandoned or substantially, continuously or repeatedly neglected or abused. Further, it is contended that the trial court erred in considering the economic factors and poverty of the parents as relevant to the issue of whether the parental rights of the appellants should be terminated.

■ The standard of proof before the trial court necessary for the termination of parental rights is clear and convincing evidence. *See Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and *N.S. v. C. and M.S.,* Ky., 642 S.W.2d 589 (1982). "Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to con-

vince ordinarily prudent-minded people." *Rowland v. Holt,* 253 Ky. 718, 70 S.W.2d 5, 9 (1934).

This court's appellate function is confined to the "clearly erroneous" review of the trial court's findings of fact based upon clear and convincing evidence, pursuant to CR 52.01. In addition, we are guided by *Yates v. Wilson,* Ky., 339 S.W.2d 458 (1960), wherein it is stated that findings of fact are clearly erroneous only if there exists no substantial evidence in the record to support them. Statutorily, KRS 199.603 provides for the termination of parental rights if abandonment, abuse or neglect is sufficiently proven. The court, if it finds such conditions, may then apply the best interest of the child standard to determine whether to terminate parental rights. Here, the trial court found: (1) that each child was an abused or neglected child; (2) that each of the parents substantially and continuously or repeatedly neglected said child or each have refused to provide parental care or protection; and (3) that the parents severally have abandoned and deserted each child.

■ First, abandonment rests mainly upon intent. Such finding is not supported in this record. To the contrary, these parents never intended to abandon their children nor have they ever voluntarily left them. This finding is superfluous but should nevertheless be set aside. Concerning the ultimate facts of abuse and neglect, we conclude the proof is substantial; therefore, it is not clearly erroneous.

■ Appellants strongly urge that the cabinet has moved for termination of parental rights because of the abject poverty involved. KRS 199.603(3)(c) forbids termination of parental rights on the basis of poverty alone. However, this is more than just a poverty case. Our natural inclinations run with the parents to preserve the family unit against state action. But our natural empathy with the parents is overcome by an unemotional review of the trial court's record. KRS 199.011(6), which defines "abused or neglected child", has application in this case. Here, the children's

health is unquestionably harmed when they are allowed to be hungry and unclothed, to run around with infected wounds, and to have obvious serious physical conditions such as deafness to go undetected and untreated. Additionally, the children were exploited. Hundreds of dollars came to them in the form of food stamps alone; yet the children were not fed and went hungry. The proof in this case lies in past performance. The risks are too great to experiment further with the children's future. Simple parental instincts and caring do not overcome the conditions displayed herein. We believe the trial court had no choice but to find abuse and neglect exercised upon these children by their respective parents, all supported by substantial evidence which is clear and convincing by persuasion.

Substantial and continuous abuse and neglect now shown, the second phase of KRS 199.603 is activated. This requires the trial court to act in the best interests of the children. In this instance it was to terminate the parental rights and place the children in foster care. We support the trial court's action as being fully in the best interests of the children.

Appellants claim the trial court erred because parental rights cannot be terminated when the cabinet has not fulfilled the statutory requirements to try to reunite the family. Under KRS 199.603(3), there is no dispute about the statutory obligation of the cabinet to make every effort to reunite the families and support them in order to keep the families together as units. This obligation is additionally reflected in the cabinet's regulations, specifically 904 KAR 1:085 § 1(991)(d). KRS 199.603(3) prescribes the factors the court shall consider in determining the best interests of the children. These factors are not activated and thus not considered unless and until a finding of abandonment, abuse or neglect is made under the preceding statutory sections, specifically, KRS 199.603(1)(a) or (b).

■ Relating specifically to the factors in KRS 199.603(3), the clear and convincing evidence standard is not required. The

factors listed are for consideration by the trier of fact. If reasonably considered by the trial court, the best interests of the child will naturally be determined. Our review of the evidence convinces us that the cabinet made reasonable efforts to aid, sustain and assist the families herein. But, for whatever reason, be it low mentality, lack of motivation, indifference, or just plain orneriness, the parents did not respond over a period of years to the efforts offered by the cabinet.

■ E.S. complains that the trial court violated her due process rights by failing to provide her a separate trial. E.S. made two motions for a trial separate from the trial of her parents, H.S. and V.S., over the termination of the parental rights of the children involved. She argues that the procedure to take her son by terminating her rights by state action is protected by the due process clause. It is her contention that the trial court's decision to try the cases together meant she had to defend her parents' social service history of six years and hope that the trial court would be able to keep the cases separate. She believes she became a victim of guilt by association with the parents.

While this argument is vigorously made, such procedural decisions, absent abuse, fall clearly within the trial court's discretion under CR 42.01, which permits consolidation of actions having common questions of law and fact. Our review is then limited to whether an abuse of that discretion was exercised concerning E.S.'s right to procedural due process. *See Scales v. United States*, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). In consideration of this claim of error it must be borne in mind that during the time in question E.S. lived with her child under the same roof and in the same conditions as did the children of H.S. and V.S. From a practical standpoint the cases cannot be separated. On the other hand, if the cases were separated, there would be a retrial and rehash of practically the same evidence. Cases as intermeshed as these should be tried together. We see no abuse of discretion or

denial of due process, particularly since there was no jury to be confused or prejudiced. There is absolutely no mention in the record that the trial court used any evidence against E.S. which was not appropriate under the circumstances. Further, there is no hint in the record that the trial court applied evidence against her parents against her. The consideration gave neither party a particular advantage. *See Massie v. Salmon*, Ky., 277 S.W.2d 49 (1955), and *Mason v. Randolph*, Ky., 304 S.W.2d 913 (1957).

■ E.S., H.S. and V.S. assert that the trial court violated their right to procedural due process of law by failing to allow discovery. This claim of error is based upon an instance where the appellants filed 156 written interrogatories under CR 33.01. The cabinet filed a 17-page summary of services provided the families; the trial court did not compel answers to the specific questions and gave the cabinet a protective order under CR 26.03(1). This ruling, we conclude, was within the trial court's discretion and was not a denial of procedural due process. The appellants were not denied discovery—their discovery was only curtailed based upon the propounding of 156 interrogatories which we agree was an undue burden upon the cabinet. We note that CR 33.01(3), limiting the number of interrogatories to 30 at a time, was not in effect. Nonetheless, we see no error in this regard.

■ Next, it is asserted that the trial court violated appellants' right to procedural due process by denying their motion for a more definite statement. The petitions for termination of parental rights were written in a bare bones manner. It is true the allegations were couched in conclusory language; however, they did comport to KRS 199.603. Inasmuch as notice pleadings prevail in Kentucky practice, we see no necessity for anything more. The emphasis is on substance over form and discovery over pleading. We construe that substantial justice was done in that the pleadings gave fair notice of what was taking place; therefore, procedural due

426

process was not lacking. *See* CR 8.01, CR 8.05 and CR 8.06.

■ The appellants assert that the trial court erred by admitting into evidence the cabinet's case record which deprived H.S. of fundamentally fair procedures. This assignment of error is the most serious one. It is an allegation of error coming to us on appeal more and more frequently. There is a perception, a wrong perception, that if the evidence is lodged in a record, regardless of how inadmissibly obnoxious it is, it nevertheless becomes admissible under the ruling of *Buckler v. Commonwealth*, Ky., 541 S.W.2d 935 (1976). There is no question that *Buckler* extended and expanded the business records or shop book rule but not without limitations. *See* R. Lawson, *Kentucky Evidence Law Handbook* § 8.65 (2nd ed. 1984). In the case at hand, the trial court permitted the cabinet's entire file to be put in as evidence. The file was compiled by numerous persons providing social service. Among the bits of information were various entries referring to P.H.S. as the child of incest of H.S. Some of these entries are not only outright hearsay, but are also hearsay upon hearsay. The rule in *Buckler* was laid down for a very practical reason, as pointed out by the cabinet, because of the necessity for using the records due to the unavailability of the testimony of those who made the entries. Our recent holding in *G.E.Y. v. Cabinet for Human Resources*, Ky.App., 701 S.W.2d 713 (1985), is applicable here.

Recognizing the clear mandate of *Santosky v. Kramer, supra*, that those facing involuntary termination of their parental rights must be afforded fundamentally fair procedures, we held in *G.E.Y., supra*, that the "unrestricted infusion of materials not otherwise admissible under our rules of evidence," particularly the inherently untrustworthy records of social workers, amounts to a denial of those due process rights. However, we have detailed much of the evidence herein to support our belief that the appellants in the instant case were not prejudiced by the hearsay, although we acknowledge its inflammatory subject matter, as the quality and substantiality of the competent evidence relied on by the trial court was abundantly sufficient to support its conclusions and judgment.

■ Appellants claim that the cabinet failed in its obligation to find placement with relatives for the appellees as an alternative to termination, thus depriving the appellants of their children without due process of law. There was no error here. Once the conditions of terminating parental rights are met, it is the duty of the cabinet to then act in the best interests of the children. Placement with relatives may be an option for consideration but nothing more. Once KRS 199.603 has been complied with and a review of the cabinet's program for the children is determined to be reasonable, then there can be no valid argument for want of due process in this regard.

We affirm the judgment of the Todd Circuit Court.

All concur.