205 S.W.3d 255 (2006)
A.D.B., Appellant,
v.
COMMONWEALTH of Kentucky, CABINET FOR HEALTH AND FAMILY SERVICES; and D.W.G., an Infant, Appellees.
No. 2005-CA-002053-ME.
Court of Appeals of Kentucky.
September 1, 2006.
Case Ordered Published by Court of Appeals October 20, 2006.
*256 Bradley S. Guthrie, Harrodsburg, KY, for appellant.
Jerry M. Lovitt, Assistant Counsel, Bluegrass Region, Cabinet for Health and Family Services, Georgetown, KY, for appellee.
Before ABRAMSON and SCHRODER, Judges; ROSENBLUM,[1] Senior Judge.

OPINION
SCHRODER, Judge.
This is an appeal from an order terminating appellant's parental rights to her infant son. From our review of the record, the Cabinet presented clear and convincing evidence of the requisite elements in KRS 625.090 warranting termination. Thus, we affirm.
In March 2004, A.D.B. brought her 6-month-old son, D.W.G., to the local health department for his regular checkup. The examination of D.W.G. revealed that his head was enlarged compared with past exams and that his development was delayed. A.D.B. stated that she had recently noticed his head was bigger when she had difficulty getting his shirts over his head. D.W.G.'s family physician referred A.D.B. to Dr. Amel Shalash, a pediatrician, to examine D.W.G. regarding the head enlargement. Dr. Shalash ordered a C-Scan which revealed two brain bleeds, a recent one and an old one which was at least over a week old, although the exact date of injury could not be determined. Dr. Shalash asked A.D.B. about any prior traumas the child had suffered, and A.D.B. reported that the only incident she knew of was that he had fallen off a couch or chair. Dr. Shalash referred A.D.B. to UK Medical Center for further evaluation. A.D.B. took D.W.G. to the UK Medical Center the next day. After their evaluation of D.W.G., the UK Medical Center contacted Dr. Shalash to advise of their conclusion that the brain bleeds were the result of non-accidental trauma and that possible child abuse was suspected.
The matter was referred to the Cabinet for Health and Family Services (the "Cabinet") and, pursuant to an emergency custody order, D.W.G. was removed from the home on March 15, 2004. The Cabinet filed a petition for temporary removal, and on March 17, 2004, the Mercer Family Court granted the petition and placed custody of D.W.G. with the Cabinet.
On March 19, 2004, A.D.B. signed her case plan with the Cabinet and was advised that she had to comply with all of the goals to be reunified with D.W.G. The goals were: 1.) submit to random drug testing; 2.) have a substance abuse/alcohol assessment from Comprehensive Care; 3.) have a domestic violence perpetrators assessment; 4.) maintain safe and appropriate housing for a minimum of three (3) months; 5.) maintain stable employment *257 for a minimum of three (3) months; 6.) work with the Cabinet; 7.) have a CATS assessment; and 8.) have regular supervised visits with D.W.G. The Cabinet also had a separate treatment plan for P.G., D.W.G.'s father, because P.G. was still residing with A.D.B. and D.W.G. at the time, and A.D.B. presented the three (3) to the Cabinet as a family unit. It was undisputed that P.G. never attempted to comply with any of the goals in his case plan and was openly hostile to the Cabinet.
In September 2004, the Harrodsburg Police Department began investigating the possible abuse of D.W.G. Detective Sergeant Gary Bradshaw interviewed A.D.B. who denied abusing D.W.G., but expressed her suspicion that P.G. was the one who had injured D.W.G. Bradshaw was not able to interview P.G. on advice of P.G.'s attorney. No criminal charges were ever filed regarding the abuse of D.W.G.
In October of 2004, the Mercer Family Court held a hearing regarding the allegations of abuse of D.W.G. According to the Cabinet, A.D.B. was present and testified at that hearing. Pursuant to this hearing, the court adjudicated that P.G. was more likely than not the person who abused D.W.G.
On April 8, 2005, the Cabinet filed a petition for involuntary termination of A.D.B.'s parental rights to D.W.G. and for appointment of guardian ad litem. Less than a month before the date of the scheduled hearing, P.G. voluntarily terminated his parental rights to D.W.G. on July 27, 2005. A.D.B.'s termination hearing was held on August 19, 2005. Caseworker Katie Hancock, Detective Bradshaw, and Dr. Shalash testified for the Cabinet. A.D.B. testified on her own behalf. On August 31, 2005, the family court entered its order terminating A.D.B.'s parental rights, finding that: A.D.B. failed to protect and preserve D.W.G.'s right to a safe and nurturing home; A.D.B., for a period of not less than 6 months, has continuously failed to provide or has been substantially incapable of providing essential parental care and protection for D.W.G.; A.D.B., for reasons other than poverty alone, has continuously failed to provide or is incapable of providing essential food, clothing, shelter, medical care or education necessary and available for D.W.G.'s well-being and there is no expectation of significant improvement in the parent's conduct in the immediately foreseeable future; A.D.B. failed to provide financial support for D.W.G.; the Cabinet offered and provided all reasonable services likely to permit reunification with the family; A.D.B. has not made sufficient progress in her circumstances, conduct, and conditions to make it in the best interests of D.W.G. that he be returned to her; that D.W.G. is a neglected child as defined in KRS 600.020; and it is in the best interests of D.W.G. that the parental rights of A.D.B. be terminated. This appeal by A.D.B. followed.
A.D.B. argues there was not substantial evidence in the record to support the trial court's findings. In a termination of parental rights case, our review "is confined to the clearly erroneous standard in CR 52.01 based upon clear and convincing evidence, and the findings of the trial court will not be disturbed unless there exists no substantial evidence in the record to support its findings." R.C.R. v. Com. Cabinet for Human Resources, 988 S.W.2d 36, 38 (Ky.App.1998) (citing V.S. v. Commonwealth, Cabinet for Human Resources, 706 S.W.2d 420, 424 (Ky.App.1986)); see also KRS 625.090 (requiring clear and convincing evidence for termination of parental rights). "Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince *258 ordinarily prudent-minded people." R.C.R. v. Com. Cabinet for Human Resources, 988 S.W.2d at 38-39 (quoting Rowland v. Holt, 253 Ky. 718, 70 S.W.2d 5, 9 (1934)).
Detective Bradshaw testified that A.D.B. told him that she was not at home when D.W.G. was injured, but she suspected that P.G. did it. A.D.B. told Bradshaw there were 6 or 7 other people who had access to the child at the time he was abused. Bradshaw stated that he encouraged her to seek an EPO against P.G. to keep him away from the child, but A.D.B. never did.
The caseworker, Katie Hancock, testified that A.D.B. failed to complete her case plan. She stated that A.D.B. would start out well whenever a new case plan was devised, and then gradually stop complying.
Regarding the CATS assessment requirement, the University of Kentucky CATS team informed the Cabinet that it had already done a CATS assessment on A.D.B. in 2001 regarding the neglect of her other children and determined that she was not a suitable caregiver. Because A.D.B. never followed through with their recommendations (for treatment of a mood disturbance and parenting education) and has not shown improvement in her parenting, the CATS team could not do another CATS assessment on A.D.B.
As to the case plan requirement to maintain stable employment for 3 months, Hancock testified that A.D.B. would stay at a job for only a short period of time and move on to another job. According to Hancock, as of the end of July 2005, A.D.B. was not working.
Hancock testified that when she visited the home where A.D.B. lived with P.G. and D.W.G., it was dirty to the point of being hazardous and was in severe disrepair. Hancock described dirty, moldy dishes piled up, laundry piled up, animal feces on the floor, a noticeable odor, and large cracks around the fireplace. Although Hancock conceded that A.D.B. had made improvements relative to cleanliness and structural repairs (paneling around the fireplace, new flooring, new toilet, new ceiling, window and baseboard repair, painting), Hancock maintained that it had never been clean when she visited.
According to Hancock, A.D.B. was ordered to pay $60 a month child support for D.W.G., but A.D.B. made only one payment and was in arrears $500 at the time of the hearing.
As for the drug testing requirement, Hancock testified that A.D.B. submitted to two tests which were clean, but did not submit to any further testing. Hancock stated that the Cabinet's position is if the parent does not show up for requested drug testing, it is considered a dirty test.
As for her visitation with D.W.G., Hancock testified that A.D.B. started out visiting D.W.G. weekly per the schedule, but then she would stop coming, making excuses like she could not get there because of work or because it was emotionally too hard to visit D.W.G. Consequently, the Cabinet would have to draw up another visitation schedule and ultimately A.D.B. would fall into the same pattern of starting out well and then missing visits. Hancock testified there was a 14-week period when A.D.B. did not visit with D.W.G.
Hancock also testified that A.D.B. had three other substantiations of neglect relative to her other children. A.D.B., who was 23 years old at the time of the hearing in the present case, has three other children. Hancock testified that the other incidents of neglect were for allowing unsupervised visits with A.D.B.'s mother (who had neglected or abused A.D.B.), not adequately supervising her child when the *259 child wandered out into the street while bathing another child, and leaving children with a babysitter and not returning home until the following day. While A.D.B.'s parental rights to these other children were not terminated and she apparently has visitation with them, none of them were in her custody at the time of the hearing in the instant case.
Relative to P.G., Hancock testified that when A.D.B. was first confronted regarding the suspected abuse of D.W.G., A.D.B. told the Cabinet that there was a good chance it was P.G. who had hurt D.W.G. The Cabinet then advised A.D.B. (prior to D.W.G. being removed) not to let P.G. be unsupervised around D.W.G.A.D.B., however, continued to live with P.G. until the end of July 2005, when he voluntarily terminated his parental rights.
A.D.B.'s testimony at the hearing was often in direct conflict with Hancock's testimony. Regarding visitation with D.W.G., A.D.B. testified that she never missed 14 weeks of visits. She admitted missing two visits in December 2004 because of the weather and her mom being in the hospital, but maintained that she called the Cabinet both times. According to A.D.B., when she came to visit D.W.G. in January 2005, her visits were suspended until a new visitation contract could be drawn up. A.D.B. testified that there were times she came to visit D.W.G. and Hancock could not find D.W.G. or he missed a visit because of a doctor's appointment. A.D.B. recalled another time she missed a visit because Hancock was on vacation and another when A.D.B. was late because of waiting for a train. When she would call to reschedule, the Cabinet would not return the call until it was too late for a visit. A.D.B. testified that when she visits with D.W.G., he is always happy to see her, clings to her, tells her he loves her, and calls her mommy.
As to the condition of the home, A.D.B. testified that while the outside is rough, the inside is in perfect condition. A.D.B. stated that on Hancock's last visit to the home, Hancock walked in the front door, went straight to the kitchen without looking around, said "I see no improvement," and then left. A.D.B. admitted that one time when Hancock visited, there were dog feces on the floor because she had puppies in the middle of the winter and one had had an accident.
Regarding her employment history, A.D.B. maintained that she had good reasons for changing jobs. She testified that she left her job at Bill's Market to make more money at Wendy's where she stayed for 5-6 months. After Wendy's, A.D.B. claimed she went back to Bill's Market for more money and was there 7 months until she broke her wrist and then was off for 2 months receiving workers' compensation benefits. After that, A.D.B. stated she went to work at a nursing home and was there for 6 months until she was laid off. A.D.B. testified that she currently works at a Shell gas station. According to A.D.B., between March 2004 and August 2005, she was off work for 2 weeks to move and 2 months for her broken wrist.
As for her not paying child support, A.D.B. claimed that she went to the child support office, gave them the address of 3 of her employers (Bill's, the nursing home and Shell) so that the funds could be directly withdrawn from her paychecks. However, for whatever reason, the money was never taken out.
A.D.B. maintained that she has never had a drug problem. She testified that the reason she failed to take any more drug tests was that she did not have transportation to get to the hospital and because she could not afford the testing ($269).
*260 A.D.B. testified that she completed substance abuse and anger assessments with Comp Care. As proof, A.D.B. offered a letter written by a therapist at Comp Care into evidence. The letter, dated September 21, 2004, stated that A.D.B. had completed an evaluation for anger control and child abuse problems, and that because she was complying with the Cabinet's drug screening requirement, she did not need to be evaluated for substance abuse unless she tested positive for substance abuse.
In defending her continued relationship with P.G., A.D.B. testified that she stayed with him because she wanted D.W.G. to come home to the family he had left. She also testified that she thought she could get D.W.G. back quicker if she stayed with P.G. as a family than as a single mom. Contrary to what she allegedly told Hancock and Detective Bradshaw, A.D.B. testified that she did not believe that P.G. could have hurt D.W.G. because she had never seen him hurt a child before. She stated that she had no idea what caused D.W.G.'s injuries. A.D.B. further testified that she did not understand the court's ruling in October 2004 adjudicating P.G. to be the likely perpetrator of the abuse of D.W.G. Had she understood the ruling, A.D.B. maintained she would have made P.G. move out at that time. A.D.B. admitted that the Cabinet told her to get rid of P.G. before anything ever went to court and that she could not get D.W.G. back unless she was not with P.G. anymore.
KRS 625.090(1) and (2) provides:
(1) The Circuit Court may involuntarily terminate all parental rights of a parent of a named child, if the Circuit Court finds from the pleadings and by clear and convincing evidence that:
(a) 1. The child has been adjudged to be an abused or neglected child, as defined in KRS 600.020(1), by a court of competent jurisdiction;
2. The child is found to be an abused or neglected child, as defined in KRS 600.020(1), by the Circuit Court in this proceeding; or
3. The parent has been convicted of a criminal charge relating to the physical or sexual abuse or neglect of any child and that physical or sexual abuse, neglect, or emotional injury to the child named in the present termination action is likely to occur if the parental rights are not terminated; and
(b) Termination would be in the best interest of the child.
(2) No termination of parental rights shall be ordered unless the Circuit Court also finds by clear and convincing evidence the existence of one (1) or more of the following grounds:
(a) That the parent has abandoned the child for a period of not less than ninety (90) days;
(b) That the parent has inflicted or allowed to be inflicted upon the child, by other than accidental means, serious physical injury;
(c) That the parent has continuously or repeatedly inflicted or allowed to be inflicted upon the child, by other than accidental means, physical injury or emotional harm;
(d) That the parent has been convicted of a felony that involved the infliction of serious physical injury to any child;
(e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection, *261 considering the age of the child;
(f) That the parent has caused or allowed the child to be sexually abused or exploited;
(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child;
(h) That:
1. The parent's parental rights to another child have been involuntarily terminated;
2. The child named in the present termination action was born subsequent to or during the pendency of the previous termination; and
3. The conditions or factors which were the basis for the previous termination finding have not been corrected;
(i) That the parent has been convicted in a criminal proceeding of having caused or contributed to the death of another child as a result of physical or sexual abuse or neglect; or
(j) That the child has been in foster care under the responsibility of the cabinet for fifteen (15) of the most recent twenty-two (22) months preceding the filing of the petition to terminate parental rights.
As for the requirement in KRS 625.090(1)(a)1., it was undisputed that the family court in the juvenile court proceeding in this case determined that D.W.G. was an abused or neglected child as defined in KRS 600.020(1). This order was read into the record in the termination hearing and the family court took judicial notice of this adjudication.
As for the requirement in KRS 625.090(2) that one or more grounds for termination exist, we believe the Cabinet presented clear and convincing evidence of A.D.B.'s parental failures pursuant to subsections (e) and (g) of the statute. The evidence at the hearing established that A.D.B. thought there was a good chance that P.G. was the perpetrator of the abuse of D.W.G. and she knew P.G. had no intention of complying with the Cabinet's case plan for him, yet she continued to live with P.G. for 14 more months, until he voluntarily terminated his parental rights. As for A.D.B.'s claim that she was unaware that the court had adjudicated that P.G. had in all probability been the one to abuse D.W.G., we believe her claim is disingenuous as she was present and testified at that very hearing. There was also undisputed evidence that D.W.G. had an older brain bleed for which A.D.B. did not seek timely medical treatment for D.W.G. Finally, there was the evidence of A.D.B.'s failures regarding the visitation of D.W.G. In our view, all of these circumstances constitute substantial, clear and convincing evidence that A.D.B., for a period of not less than 6 months, has continuously failed to provide essential parental care and protection for D.W.G. and there is no reasonable expectation of improvement in parental care and protection. KRS 625.090(2)(e).
We also believe there was substantial, clear and convincing evidence that A.D.B., for reasons other than poverty alone, continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education necessary for D.W.G.'s well-being, *262 and there is no reasonable expectation of significant improvement in A.D.B.'s conduct. KRS 625.090(2)(g). Relative to the condition of A.D.B.'s home and her employment record, the evidence at the hearing was conflicting. However, the trial court, as fact finder in the case, had the opportunity to observe the witnesses and judge their credibility. R.C.R. v. Com. Cabinet for Human Resources, 988 S.W.2d at 39. Thus, it was the trial court's prerogative to believe Hancock over A.D.B. Further, it was undisputed that A.D.B. failed to pay child support for D.W.G., with the exception of one payment. And, as noted earlier, A.D.B. failed to obtain prompt medical treatment for D.W.G.'s prior head injury.
The final requirement for termination of parental rights under KRS 625.090(1)(b) is a finding that termination would be in the best interests of the child. KRS 625.090(3) sets forth the following factors the court must consider in making such determination:
(a) Mental illness as defined by KRS 202A.011(9), or mental retardation as defined by KRS 202B.010(9) of the parent as certified by a qualified mental health professional, which renders the parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for extended periods of time;
(b) Acts of abuse or neglect as defined in KRS 600.020(1) toward any child in the family;
(c) If the child has been placed with the cabinet, whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents unless one or more of the circumstances enumerated in KRS 610.127 for not requiring reasonable efforts have been substantiated in a written finding by the District Court;
(d) The efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child;
(e) The physical, emotional, and mental health of the child and the prospects for the improvement of the child's welfare if termination is ordered; and
(f) The payment or the failure to pay a reasonable portion of substitute physical care and maintenance if financially able to do so.
Pursuant to subsection (b), besides the abuse and neglect of D.W.G. in this case, there was evidence presented of three other substantiations of neglect by A.D.B. regarding her other children. As for subsection (c), Hancock testified about the Cabinet's efforts and case plan for A.D.B. in order to be reunited with D.W.G. and the fact that, although she made some improvements and would start out complying, A.D.B. did not ultimately meet the goals. Specifically, Hancock testified that the Cabinet had to draw up several visitation contracts when A.D.B. would begin to miss visitations with D.W.G. Regarding the physical, emotional, and mental well-being of D.W.G. (subsection (e)), Hancock testified that D.W.G. had been in the same foster home since his removal and that he was doing very well. Hancock testified that he considered the foster family his family and called the foster parents "mom" and "dad". A.D.B. in her testimony even recognized that D.W.G. had bonded with and was very attached to his foster family. As to subsection (f), as discussed earlier, A.D.B. failed to pay child support for *263 D.W.G., with the exception of one payment, even though she was employed.
And, finally, in terms of the efforts and adjustments made by A.D.B. in her conduct and circumstances in order to be reunited with D.W.G. (subsection (d)), the most significant change made by A.D.B. was finally making P.G. move out. However, what is more persuasive and troubling to this Court, as it was to the family court, is the fact that A.D.B. continued to live with P.G. for 14 months in spite of her knowing there was a good chance he was the one who had abused D.W.G.A.D.B. testified that the Cabinet made it clear that she would have to leave P.G. to get D.W.G. back, yet she stayed with P.G. until one month prior to the termination hearing. In our view, A.D.B.'s continued cohabitation and relationship with P.G. demonstrates that she was not willing to put the child's welfare first and she was not committed to being reunited with D.W.G.
We believe the above was substantial, clear and convincing evidence that termination of A.D.B.'s parental rights was in the best interests of D.W.G. Accordingly, for the reasons stated above, the order of the Mercer Family Court terminating A.D.B.'s parental rights is affirmed.
ALL CONCUR.
NOTES
[1] Senior Judge Paul W. Rosenblum sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.