RENDERED: OCTOBER 20, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0778-MR

RACHEL PETRIE (NOW GIBNEY)                                    APPELLANT

|       |                                          |          |
|-------|------------------------------------------|----------|
| v.    | APPEAL FROM TODD CIRCUIT COURT           |          |
|       | HONORABLE JOE W. HENDRICKS, JR., JUDGE    |          |
|       | ACTION NO. 20-CI-00027                    |          |

ROBERT PETRIE                                                  APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, JONES, AND TAYLOR, JUDGES.

JONES, JUDGE: Rachel Petrie (now Gibney) appeals the final decree of the Todd

Circuit Court designating her former husband, Robert Petrie, as the primary

residential parent of their two minor children and granting Rachel timesharing

every other weekend. Rachel also appeals the trial court's order denying her

motion to recuse Circuit Court Judge Joe W. Hendricks, Jr., from presiding over

the underlying dispute.  Following review of the record and all applicable law, we affirm.

## I.  BACKGROUND

Rachel and Robert were married in 2016.  They have two children in common:  E.R.P., born in 2014, and I.E.P., born in 2017.  The parties separated on June 16, 2018.  On March 6, 2020, they entered into a Separation Agreement.  Paragraph 1 states:

> The parties shall share joint legal custody of the minor children, [E.R.P. and I.E.P.] to allow for 50/50 parent time as deemed appropriate by the Court.  Should the parties disagree on visitation then visitation will be consistent with the Kentucky Model Visitation/Time Sharing Guidelines.  No child support is required at this time.  The parties shall be equally responsible for incurred expenses related to the maintenance of [the children].  The parties shall claim one child each for tax purposes.

(Record (R.) at 9.)  On March 10, 2020, Rachel filed a verified petition for dissolution of the parties' marriage in Todd Circuit Court.  On the same day, she also filed her deposition upon interrogatories and the parties' Separation Agreement with the court.  On March 13, 2020, the trial court entered findings of fact, conclusions of law, and a decree dissolving the marriage.  The parties' Separation Agreement, including its provision for joint custody and equal timesharing, was incorporated by reference into the trial court's final decree.

In reality, Rachel and Robert did not adhere to the timesharing portion of their Separation Agreement. Instead, without court intervention, the parties worked out a new schedule wherein the children resided primarily with Rachel during the week and had timesharing with Robert on weekends. This informal schedule appeared, at least initially, to satisfy everyone involved; although Rachel contends that Robert was not as involved in the children's lives as he should have been and that their timesharing with him was almost always initiated by his parents with whom he resided.

Sometime after the parties' divorce, Rachel married Ryan Gibney. Around April 2021, Rachel, Mr. Gibney, and the two children moved from Todd County to Bowling Green, Kentucky. Rachel asserts that the purpose of the move, in part, was so that the children could attend a better-rated school the following year. She further asserts that she spoke to Robert before the move and that he did not object to her relocating to Bowling Green with the children. According to Rachel, after the move, Robert continued to exercise timesharing with the children every other weekend. Either Rachel would drive the children to Todd County, or she would meet Robert's parents somewhere in between to exchange the children.

Complications arose in September/October 2021, when one of the children allegedly told Rachel that she had been touched inappropriately by one of

her paternal cousins while at Robert's parents' home.[1]  Rachel did not report the allegations to either law enforcement or the Cabinet for Health and Family Services ("Cabinet").  Instead, Rachel enrolled the child in therapy and reached out to Robert's father, Sherwood, for assistance.  Sherwood did not respond to Rachel's satisfaction prompting her to stop allowing the children to have timesharing with Robert in Todd County.  For a short time, Rachel allowed timesharing to take place in Bowling Green.  However, in October 2021, after picking the children up in Bowling Green, Robert's parents took them back to Todd County for the afternoon.  Shortly thereafter, Rachel refused to permit Robert and his family to have timesharing with the children.

Acting with the assistance of his counsel, Ami Brooks, on February 25, 2022, Robert filed a motion seeking to have Rachel held in contempt for violating the timesharing provisions of the parties' dissolution decree and seeking to be made the children's primary residential parent.  Rachel filed a written response objecting to Robert being designated as the primary residential parent.  She also filed a motion to set child support, a motion for supervised visitation, and requested the trial court judge, Hon. Joe W. Hendricks, to recuse on the basis that

---

[1] Roberts' parents have nine grandchildren.  Robert's mother babysat many of the grandchildren in her home.  Since Robert lived with his parents, I.E.P. and E.R.P. were around the other children when they had their timesharing with Robert.

the judge had been law partners with Robert's attorney, Ms. Brooks, immediately prior to his taking the bench. The pending motions were set to be heard by the trial court on March 29, 2022.

The first matter the court addressed at the hearing was Rachel's motion to recuse.

> THE COURT: [A]nd then we also have a motion to disqualify. Ms. Dahl do you have anything else to add to your motion to disqualify?
>
> RACHEL'S COUNSEL: No, Sir. I think I covered everything, and I've never met the Court, so nice to meet you, Your Honor. But – but no, I don't – I don't think that the Court is necessarily, you know, required to automatically recuse itself from these cases, but my client did raise this as a concern to me, so I did want to bring it to the Court's attention and request the Court to consider it.
>
> THE COURT: All right. The motion doesn't sufficiently state the basis for disqualification. And under Kentucky's rules, if I'm not – If I'm not required to disqualify, I'm required to sit. So the motion to disqualify is denied.[2]

The Court then turned to the substantive issues before it. The truth of Rachel's allegations regarding the alleged sexual abuse as well as her failure to timely notify the Cabinet about the alleged abuse became major issues at the hearing.

---

[2] The trial court entered a signed handwritten order that same day which simply states "m/disqualify is DENIED."

Robert was the first witness called to testify. According to him, the parties had a good co-parenting relationship prior to Rachel's move to Bowling Green. Before the move, the children stayed with Rachel during the week and had timesharing with Robert on the weekends. Robert testified that Rachel did not tell him she was contemplating moving to Bowling Green with the children; instead, she waited until she and Mr. Gibney had already purchased a home to inform him that the family would be moving, leaving him little choice in the matter. Robert also testified that Rachel stopped communicating with him in October 2021 but did not tell him why. Specifically, Robert testified that Rachel never told him about the alleged sexual abuse or expressed any concern to him about how the children were cared for when they were with him at his parents' house.

Robert explained that he had been residing with his parents in Todd County since the divorce and that was where the children stayed when they were with him. Robert testified that he had a separate bedroom at his parents' house as did the children. He denied that he slept in the same bed as the children when they were with him. In any event, he said that he was currently in the process of building his own home and it would have three bedrooms when it was finished in a few months.

Robert's mother, Karen, also testified at the hearing. Her description of the living arrangements differed somewhat from Robert's testimony. She said

that while Robert had his own bedroom in the home, the children did not.[3] Karen testified that Robert was a good father but admitted that she was the primary point of contact with Rachel as related to the children. Karen explained the family came to an impasse around November 1, 2021, after she and Sherwood picked up the children in Bowling Green and took them back to Todd County. Karen denied that Rachel told them they could not take the children to Todd County.

Sherwood testified next. He said that the house where he and Karen resided was Robert's house meaning they lived with Robert and not the other way around.[4] Sherwood denied that Rachel had ever expressed any concerns about the children's care to him or that she had ever asked him and Karen not to take the children to Todd County.

Rachel's testimony differed markedly. Rachel testified Robert had never exercised his right to equal parenting time and that he had never been very involved in the children's lives. Rather, any timesharing Robert had was because of Karen. Rachel expressed concerns that the children did not have a separate bedroom at Robert's current home, and she believed that it was not proper for the children to co-sleep with Robert as a matter of course. Rachel then explained that

---

[3] Karen described Robert's "bedroom" as actually being a utility room that had been converted to a bedroom. She stated that when the children stayed in the home, Robert slept with his son on a bed in the converted utility room and his daughter slept on a sofa in the living room.

[4] Sherwood's rationale for this statement was that after he and Karen died, Robert would inherit the house.

the family's problems arose after one of the children told her that a cousin had inappropriately touched her while she was at Robert's house.[5] Rachel said she responded by putting the child in therapy and telling Sherwood about it sometime in late October. According to Rachel, Sherwood did not take the matter seriously simply stating that he could not control what occurred in another family's home.

Rachel believed the allegations were true explaining that the child had been "sexually acting out." She described this behavior as the child smacking and sticking her bottom out, smacking Rachel's bottom, and offering to tickle Rachel's back. Rachel testified that after the child stopped having timesharing at Robert's home, these behaviors greatly improved.

At this juncture, the trial court interrupted the hearing to question Rachel regarding whether she had reported the allegations to the Cabinet and whether she was aware that she had a duty to do so.[6] Rachel stated that she was

---

[5] The female cousin at issue was close in age to Rachel's daughter, the alleged victim.

[6] Kentucky Revised Statute ("KRS") 620.030 provides that "[a]ny person who knows or has reasonable cause to believe that a child is dependent, neglected, or abused shall immediately cause an oral or written report to be made to a local law enforcement agency or to the Department of Kentucky State Police, the cabinet or its designated representative, the Commonwealth's attorney, or the county attorney by telephone or otherwise." Pursuant to KRS 600.020(1)(a) an abused or neglected child includes "a child whose health or welfare is harmed or threatened with harm when . . . [h]is or her parent, guardian, person in a position of authority or special trust, as defined in KRS 532.045, or other person exercising custodial control or supervision of the child . . . 5. [c]ommits or allows to be committed an act of sexual abuse, sexual exploitation, or prostitution upon the child; [or] 6. [c]reates or allows to be created a risk that an act of sexual abuse, sexual exploitation, or prostitution will be committed upon the child[.]"

unsure whether she had been required to report the child's allegations but that she had not done so. The trial court then expressed grave concerns that no one had made a report to the Cabinet and that Rachel had never discussed the matter with Robert. The trial court halted the hearing so that it could make a report to the Cabinet.[7] The trial court expressed concern that Rachel "was playing games" but rescheduled the hearing pending further investigation by the Cabinet.

It was ultimately revealed that Rachel was the only person the child had allegedly talked to about the inappropriate contact. The child never told her therapist that she had been touched inappropriately and denied in an interview she had been "bad touched." No further actions were taken by either the Cabinet or law enforcement. However, Rachel continued with therapy for the child who by that time had been diagnosed with generalized anxiety disorder.

Rachel concluded her testimony in May by updating the court on the children. Rachel explained that Mr. Gibney's mother watched the children while Rachel and Mr. Gibney were at work, and Rachel planned for them to attend school in Bowling Green after the summer break. Rachel testified that she wanted to remain the children's primary residential parent. She explained that she had always overseen the children's day-to-day lives and that Robert had never taken an

---

[7] A family court has a duty to report suspected child dependency, neglect, or abuse pursuant to KRS 620.030(1). *Fugate v. Fugate*, 896 S.W.2d 621, 623 (Ky. App. 1995).

interest in their educations or been as involved with them as a father should be with his children. She further testified that the school they would attend in Bowling Green was rated better than their prior school in Todd County. If she were to remain the primary residential parent, the children could attend school in Bowling Green and Robert could exercise his timesharing on the weekends and during school breaks as he had always done in the past.

Ultimately, the trial court did not find Rachel to be credible. It appeared most concerned that Rachel had manufactured the sexual abuse allegations to gain an advantage over Robert and keep the children with her in Bowling Green. After weighing the best interest factors, the court granted Robert's motion such that he was designated the primary residential parent with Rachel to have timesharing every other weekend. The parties retained joint legal custody and Rachel was ordered to pay Robert child support.

This appeal followed.

## II. ANALYSIS

Rachel's first argument is that the trial court erroneously denied her motion to recuse requiring us to vacate all subsequent orders and remand for further proceedings, including assignment of a new judge.

Both the legislature and the Supreme Court of Kentucky have "expressed policy that mandates recusal in any proceeding in which a judge's

-10-

impartiality might reasonably be questioned." *Abbott, Inc. v. Guirguis*, 626

S.W.3d 475, 482 (Ky. 2021); KRS 26A.015(2)(e) ("Any . . . judge of the Court of

Justice . . . shall disqualify himself in any proceeding . . . [w]here he has

knowledge of any other circumstances in which his impartiality might reasonably

be questioned."); SCR[8] 4.300 Canon 2.11(A) ("A judge shall disqualify himself or

herself in any proceeding in which the judge's impartiality might reasonably be

questioned[.]"). "[T]he standard for measuring whether a judge's impartiality

might reasonably be questioned is an objective one, made from the perspective of a

reasonable observer who is informed of all the surrounding facts and

circumstances." *Abbott, Inc.*, 626 S.W.3d at 483 (internal quotation marks and

citations omitted).

"Because any judge, however candid, will naturally be loathe to

acknowledge the judge's own partiality or bias, compounded by the judge's

general duty to hear and decide matters assigned to the judge, a reviewing court

gives a motion to recuse fresh eyes, owing no deference to a refusal to recuse."

*Phillips v. Rosquist*, 628 S.W.3d 41, 54 (Ky. 2021). "Because an objective

standard is appropriate for measuring whether a judge's impartiality might

reasonably be questioned from the perspective of a reasonable observer who is

informed of all the surrounding facts and circumstances, we hold, appropriately,

---

[8] Rules of the Supreme Court.

that this determination is to be reviewed on appeal on a *de novo* basis." *Abbott, Inc.*, 626 S.W.3d at 484.

At the outset, we observe that the issue is not whether Judge Hendricks was in fact impartial; the issue is whether under the circumstance a reasonable person with knowledge of all the facts and circumstances might reasonably question his impartiality. Those facts and circumstances, as alleged by Rachel, are that Judge Hendricks and Robert's counsel were law partners immediately prior to Judge Hendricks taking the bench in 2019.

Rachel contends that the bias became more apparent as the case progressed as demonstrated by Judge Hendricks's comments concerning Rachel's actions and motives. None of the alleged comments, however, are beyond the pale or indicative of an extrajudicial bias. *Stopher v. Commonwealth*, 57 S.W.3d 787, 794-95 (Ky. 2001) (explaining that even some expressions of frustration with a litigant by judge not enough to merit recusal so long as judge does not violate the litigant's rights and conducts a basically fair if imperfect trial). They appear consistent with the duty of a judge to weigh the credibility of witnesses, and in the case of a family court matter, to make sure that allegations concerning sexual abuse were reported to the Cabinet for appropriate investigation.

Thus, we must determine whether recusal was required simply based on Judge Hendricks's being law partners with Robert's counsel prior to taking the

bench in late November 2019.[9] The general rule is that to require recusal a litigant must allege some additional circumstance beyond the former relationship between the judge and the adverse party's counsel. These facts and circumstances must be alleged in a sworn affidavit. *Abbott, Inc.*, 626 S.W.3d at 484. "The mere belief that the judge will not afford a fair and impartial trial is not sufficient grounds for recusal." *Bissell v. Baumgardner*, 236 S.W.3d 24, 29 (Ky. App. 2007) (quoting *Stopher*, 57 S.W.3d at 794-95).

Rachel did not include an affidavit with her motion to recuse as *Abbott*, rendered a year before Rachel filed her motion, requires. Additionally, she did not cite anything to support her motion to recuse other than the former business relationship of Robert's counsel, Ami Brooks, and Judge Hendricks. Specifically, she did not allege that while in private practice, Judge Hendricks served as a lawyer in the matter in controversy or that Robert's counsel represented him while Judge Hendricks was a partner at the law firm.

As noted, Judge Hendricks took the bench on or about November 25, 2019. Robert's counsel first entered an appearance in this matter on February 25, 2022, over two years later. The American Bar Association Committee on Ethics and Professional Responsibility, in Informal Opinion 87-1524 (December 14,

---

[9] We take judicial notice that Judge Hendricks was sworn in as a circuit court judge for 7th Judicial Circuit on or about November 25, 2019, after winning a special election.

1987), has expressed its opinion that "[a] judge is not disqualified from presiding at a trial solely because of a former association in private practice more than two years previously with counsel for a party." ABA Informal Op. 87-1524.[10] Accordingly, we hold that Judge Hendricks was not required to recuse himself from presiding over this matter based solely on the fact the judge was law partners with Robert's counsel over two years before counsel entered an appearance in the present dispute.

In these circumstances, given the length of time that elapsed between Judge Hendricks taking the bench and Attorney Brooks entering an appearance in this matter and Rachel's failure to include an affidavit, we do not believe that Judge Hendricks erred by failing to include a more detailed explanation to support his denial of Rachel's motion to recuse. However, even so, as *Abbott* makes clear, the better practice would have been for the judge to specifically set forth in writing the countervailing facts or considerations deemed pertinent to his denial to permit more meaningful appellate review. *Abbott, Inc.*, 626 S.W.3d at 484.

We now turn our attention to Rachel's second assignment of error that the trial court erred when it granted Robert's motion and designated him as the

---

[10] "Ethics opinions and American Bar Association standards are guides to determining what is reasonable and may be valuable measures of the prevailing professional norms of effective representation[.]" *U.S., ex rel. U.S. Attorneys ex rel. Eastern, Western Districts of Kentucky v. Kentucky Bar Ass'n,* 439 S.W.3d 136, 149 (Ky. 2014).

children's primary residential parent.  Generally, in family court matters our review is governed by the clearly erroneous standard.  CR[11] 52.01.  Under this standard, the family court's factual findings will not be disturbed unless there exists no substantial evidence in the record to support them.  *See M.P.S. v. Cabinet for Human Resources*, 979 S.W.2d 114, 116 (Ky. App. 1998) (citing *V.S. v. Commonwealth, Cabinet for Human Resources*, 706 S.W.2d 420, 424 (Ky. App. 1986)).

Clear and convincing proof does not necessarily mean uncontradicted proof, but rather requires proof of a probative and substantial nature that is sufficient to convince ordinarily prudent minded people.  *Id.* at 117.  However, whether the family court correctly applied the law to the facts is a question of law that we review *de novo*.  *E.K. v. T.A.*, 572 S.W.3d 80, 82 (Ky. App. 2019).

Before we consider the trial court's findings of fact, we must first determine the appropriate legal standard.  Throughout these proceedings, the parties' and the trial court used the terms custody, timesharing, and visitation interchangeably.  As explained by the Kentucky Supreme Court, however, these terms have distinct definitions and are governed by different legal standards.  *Pennington v. Marcum*, 266 S.W.3d 759, 765 (Ky. 2008).  Pursuant to KRS 403.340, a motion to modify custody shall not be filed within two years of the

---

[11] Kentucky Rules of Civil Procedure.

initial custody decree unless the petitioner asserts by affidavit that the child is in danger of serious harm, or the child has been placed with a *de facto* custodian. In contrast, pursuant to KRS 403.320, a motion to modify timesharing may be filed at any time as it is evaluated according to the best interest standard set forth in KRS 403.270.

Confusingly, without citing any of the relevant statutes, Robert styled his initial filing as a motion for modification of custody but in the body of the motion he requested only to be designated as the primary residential parent. Reviewing the entire record, it is apparent that both the trial court and the parties treated Robert's motion as a motion to modify timesharing only. *Humphrey v. Humphrey*, 326 S.W.3d 460, 462 (Ky. App. 2010). Notably, during the second part of the hearing on May 10, 2022, the trial court noted that it was applying the best interest standard set forth in KRS 403.270, which governs motions to modify timesharing. The parties did not object or seek to correct the trial court's characterization of Robert's motion as seeking only to modify timesharing. Additionally, the trial court stated in its final order that it was granting Robert's motion and designating him as the primary residential parent, but that custody would remain joint.

Modification of timesharing is determined pursuant to KRS 403.320(3). *Pennington*, 266 S.W.3d at 765. The statute provides: "The court

may modify an order granting or denying visitation [or timesharing] rights whenever modification would serve the best interests of the child; but the court shall not restrict a parent's visitation [or timesharing] rights unless it finds that the visitation [or timesharing] would endanger seriously the child's physical, mental, moral, or emotional health." KRS 403.320(3).

In this case, the trial court first determined that Robert and Rachel currently reside too far apart for them to practically exercise equal timesharing with the children. Then, applying the best interest factors, the trial court determined that on the balance, the children would be best served by living with Robert. Specifically, the trial court considered the children had spent most of their lives in Todd County, and that Robert's parents were available to assist with childcare in Todd County, instead of the children being watched by step-relatives. It also considered Rachel's past reluctance to allow the children to visit Robert in Todd County, and the likelihood she would repeat this behavior. It also found Robert to be more credible and sincere in his motivations than Rachel. Credibility determinations are exclusively within the province of the lower courts, and we cannot second-guess them. *Truman v. Lillard*, 404 S.W.3d 863, 868 (Ky. App. 2012).

In sum, while we might have decided this matter differently, we cannot discern any error of law or abuse of discretion on the trial court's part.

While Rachel may disagree with the trial court's decision to modify timesharing, she has failed to point us to any actionable error.

## III. CONCLUSION

For the foregoing reasons, we affirm the orders of the Todd Circuit Court.

CETRULO, JUDGE, CONCURS.

TAYLOR, JUDGE, DISSENTS AND DOES NOT FILE SEPARATE OPINION.

BRIEFS FOR APPELLANT:

Taylor R. Dahl
Clarksville, Tennessee

BRIEF FOR APPELLEE:

Ami L. Brooks
Russellville, Kentucky