UNITED STATES of America, by and Through the UNITED STATES ATTORNEYS for the EASTERN and WESTERN DISTRICTS OF KENTUCKY, Movant

v.

KENTUCKY BAR ASSOCIATION, Respondent.

No. 2013–SC–000270–KB.

Supreme Court of Kentucky.

Aug. 21, 2014.

Kerry Brent Harvey, United States Attorney, Charles P. Wisdom, Jr., Assistant United States Attorney, Eastern District of Kentucky, David Jason Hale, United States Attorney, Terry Martin Cushing, Assistant United States Attorney, Western District of Kentucky, Counsel for Movant.

John Downing Meyers, Executive Director, Thomas H. Glover, Chief Bar Counsel, Kentucky Bar Association, Brian Scott West, General Counsel, Department of Public Advocacy, Counsel for Respondent.

Francis William Heft, Jr., Office of the Federal Defender, Counsel for Amicus Curiae Western Kentucky Community Defender, Inc.

Jerry J. Cox, Jerry J. Cox, P.S.C., John Wesley Hall, Jr., Joseph V. Aprile, II, Lynch, Cox, Gilman & Goodman, P.S.C., Counsel for Amicus Curiae Legal Ethics Practitioners, Legal Ethics Professors, and National Association of Criminal Defense Lawyers.

Larry David Simon, Counsel for Amicus Curiae the Innocence Network.

Scott T. Wendelsdorf, Office of the Federal Defender, Counsel for Amicus Curiae Western Kentucky Community Defender, Inc.

Opinion of the Court by Chief Justice MINTON.

"[O]urs is for the most part a system of pleas, not a system of trials[.]"[1] Plea

---

1. *Missouri v. Frye,* —— U.S. ——, 132 S.Ct. 1399, 1407, 182 L.Ed.2d 379 (2012) (internal

bargaining is "not some adjunct to the criminal justice system; it *is* the criminal justice system."[2] The pervasiveness of plea bargain agreements in the Courts of the Commonwealth cannot be overstated. Today, we deal with the ethical ramifications of one aspect of this "horse trading between prosecutor and defense counsel[.]"[3]

The United States Attorneys for the Eastern and Western Districts of Kentucky (United States) have moved this Court to review the merits of Kentucky Bar Association (KBA) Ethics Opinion E–435, an ethics advisory opinion, which finds the use of ineffective-assistance-of-counsel (IAC) waivers in plea agreements violates our Rules of Professional Conduct. We agree with the KBA that the use of IAC waivers in plea bargain agreements (1) creates a nonwaivable conflict of interest between the defendant and his attorney, (2) operates effectively to limit the attorney's liability for malpractice, and (3) induces, by the prosecutor's insertion of the waiver into plea agreements, an ethical breach by defense counsel. Consequently, we hold that E–435 accurately states our ethical rules.

## I. FACTUAL AND PROCEDURAL HISTORY.

In November 2012, the KBA Board of Governors formally adopted E–435 and published it in the March 2013 issue of *Bench & Bar*, the KBA's monthly publication. A month later, the United States Attorneys of both the Eastern and Western Districts of Kentucky petitioned this Court for review of E–435 under Supreme Court Rule (SCR) 3.530(12).[4] The use of IAC waivers is a common practice in the United States' plea negotiations, so it argues it has been aggrieved by E–435's declaration.

The KBA undertook to answer two questions through E–435:

(1) May a criminal defense lawyer advise a client with regard to a plea agreement that waives the client's right to pursue a claim of ineffective assistance of counsel as part of the waiver of the right to collaterally attack a conviction covered by the plea agreement?

(2) May a prosecutor propose a plea agreement that requires a waiver of the defendant's or potential defendant's right to pursue a claim of ineffective assistance of counsel relating to the matter that is the subject of the plea agreement?

The KBA answered both questions in the negative. According to the KBA, the defense attorney's personal interest "in not having his or her representation of the client challenged on the basis of [IAC]" and "in not having his or her representation of the client found to be constitutional-

---

quotation marks omitted).

**2.** *Id.*

**3.** *Id.* (internal alteration removed).

**4.** SCR 3.530(12) provides a direct appeal to this Court for the review of KBA ethics advisory opinions. The rule reads:

Any person or entity aggrieved or affected by a formal opinion of the Board may file with the clerk [of this Court] within thirty (30) days after the end of the month of publication of the KENTUCKY BENCH & BAR in which the full opinion or a synopsis thereof is published, a copy of the opinion, and, upon motion and reasonable notice in writing to the Director, obtain a review of the Board's opinion by the Court. The Court's action thereon shall be final and the Clerk shall furnish copies of the formal order to the original petitioner, if any, the movant and the Director. The movant shall file a brief in support of the review, and the Director may file a response brief thirty days thereafter.

ly ineffective[,]" "create[d] a 'significant risk' that the representation of the client 'will be materially limited.' " The KBA relied on SCR 3.130–1.7, our rule dealing with conflicts of interest, in reaching this conclusion. With regard to question 1, the KBA additionally found counseling defendants on an IAC waiver violated SCR 3.130–1.8(h), our rule prohibiting any "agreement prospectively limiting the lawyer's liability to a client for malpractice[.]" The KBA acknowledged –1.8(h) does not explicitly "apply to the plea agreement situation"; but much like an IAC claim, "the underlying basis for a malpractice claim is the attorney's own professional conduct." And "[i]f a lawyer ethically cannot advise a client about a malpractice limitation," then "a lawyer ethically cannot advise a client about an [IAC] waiver."

For question 2, the KBA focused primarily on the special role of the prosecutor as a "minister of justice[.]" In sum, the KBA found it was "inconsistent with the prosecutor's role as a minister of justice and the spirit of SCR [3.130–](3.8(b)) for a prosecutor to propose a plea agreement that requires the individual to waive his or her right to pursue a claim of [IAC]. In making such a proposal, a prosecutor is assisting or inducing another lawyer . . . to violate the Rules of Professional Conduct[.]"

Because this Court is constitutionally charged with the regulation of the practice of law in the Commonwealth and the declarations made by E–435 are matters of statewide concern, we granted the United States' petition.

## II. ANALYSIS.

■ Our Rules of Professional Conduct permit the KBA's Ethics Committee to issue both informal and formal ethics opinions to provide clarity to members of the bar regarding what conduct is permissible by a licensed attorney. The procedure for this is set out in SCR 3.530. Initially, the Ethics Committee provides a recommendation to the KBA Board of Governors for approval. "If the recommended opinion is approved by three-fourths of the Board of Governors, it carries the weight of an advisory opinion. . . . On proper request by an aggrieved party, we have the authority to evaluate the opinion and determine whether it accurately states the law." [5] We do so today and, of course, because of the advisory nature of E–435, we are not bound by its terms.[6] In fact, while the KBA functions as our agent in disciplinary matters,[7] the Kentucky Constitution establishes this Court as the ultimate rulemaking body for ethical attorney conduct.[8] Consequently, we engage in de novo review.

### A. E–435 does not Violate the Supremacy Clause or Conflict with Federal Law.

Before proceeding with our review, we must address an issue of weighty concern. The United States asserts that E–435 violates the Supremacy Clause [9] because it stands in direct conflict with federal case law, statutes, and regulations. If we accept this argument, we would be compelled to vacate E–435 as applied to the United States. For several reasons, we wholly

**5.** *Countrywide Home Loans, Inc. v. Kentucky Bar Ass'n,* 113 S.W.3d 105, 107 (Ky.2003).

**6.** *Id.*

**7.** *Ex parte Auditor of Public Accounts,* 609 S.W.2d 682, 689 (Ky.1980).

**8.** *See* Ky. Const. § 116; *Kentucky Bar Ass'n v. Deters,* 406 S.W.3d 812, 822 (Ky.2013).

**9.** U.S. Const. art. VI, cl. 2.

disagree with the United States' "remarkable" [10] notion.

■ The Supremacy Clause, "eponymously enough," [11] dictates that the Constitution, Laws of the United States, and United States' treaties "shall be the supreme law of the land[.]" In operation, the Supremacy Clause invalidates state laws that "interfere with, or are contrary to," [12] federal law.

The amenability of federal-government attorneys to any ethics guidelines—let alone state ethics guidelines—has been the subject of debate. Before 1998, attempting to determine what ethics rules applied to federal attorneys was nearly a fool's errand. [13] Following a protracted battle over the practice of certain federal prosecutors who, despite ethics prohibitions, made direct contact with persons represented by counsel, [14] Congress enacted 28 U.S.C. § 530B, commonly called the McDade Amendment. [15] This law attempted to settle this issue by binding all government attorneys to "State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." The United States Attorney General, under § 530B, is vested with the authority to "make and amend rules of the Department of Justice to assure compliance with [§ 530B]."

To provide guidance to government attorneys, the Attorney General issued 28 C.F.R. § 77.1–.4. These regulations put some flesh to the § 530B bone. The relevant scope of § 530B covers "rules enacted or adopted by any State ... or by any federal court, that prescribe ethical conduct for attorneys and that would subject an attorney ... to professional discipline, such as a code of professional responsibility." [16] Section 530B's application to E–435 is clear.

According to the United States Attorney General, § 530B "requires Department attorneys to comply with state and local federal court rules of professional responsibility[.]" [17] Going further, § 530B "imposes on Department attorneys the same rules of professional responsibility that apply to non-Department attorneys"; [18] and Department attorneys are required to comply with state ethical rules "to the same extent and in the same manner as other attorneys in that State[.]" [19]

**10.** *Arizonans for Official English v. Arizona*, 520 U.S. 43, 58 n. 11, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).

**11.** John Harrison, *The Constitutional Origins and Implications of Judicial Review*, 84 Va. L.Rev. 333, 350 (1998).

**12.** *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824).

**13.** *See, e.g., Collins v. Dept. of Justice*, 94 M.S.P.R. 62, 68 (Aug. 22, 2003) ("Before 1998, the question of whether to apply state or 'national' ethics rules to attorneys appearing before the Board would have been difficult to resolve.").

**14.** For an example of this battle, see *U.S. ex rel O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252 (8th Cir.1998). Some sources claim this case served as the impetus for § 530B. *See* Everytrial Criminal Defense Res. Book § 12:2 (2013).

**15.** *See* Note, *Federal Prosecutors, State Ethics Regulations, and the McDade Amendment*, 113 Harv.L.Rev.2080, 2080 n. 2 (2000) ("The Amendment took its name from its chief sponsor in the U.S. House of Representatives, Congressman Joseph McDade (R–Pa.).").

**16.** 28 C.F.R. § 77.2(h).

**17.** 28 C.F.R. § 77.1(b).

**18.** *Id.* at (c).

**19.** 28 C.F.R. § 77.3.

■ But § 530B should not "be construed in any way to alter federal substantive, procedural, or evidentiary law[.]"[20] On its face, this provision appears to be an attempt at federal preemption through regulation. Normally, when Congress has explicitly expressed its intent to preempt state law; "a reviewing court's task[, therefore,] is reduced to determining the scope of that intended preemption."[21] This Court, acting in review of possible federal preemption, "must consider not only the language of the statute but also the statute's legislative history[,]" which, despite its debated role in interpretative methodology,[22] can serve as "an important indicator of Congress's intent."[23]

of attorneys is an area traditionally occupied by the States is not up for dispute. When faced with attempted Congressional action in such an area, as we are here, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[26] But, "[i]t is often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory measures has left the police power of the States undisturbed except as the state and federal regulations collide."[27] Even without § 530B, the Supremacy Clause demands E–435's lurking constitutional concerns be resolved.[28]

■ Our "interest in the professional conduct of attorneys involved in the administration of criminal justice[, however,] is of special importance."[24] So strong is this "traditional and primary responsibility" that it "call[s] for exceptional deference by the federal courts."[25] That the regulation

■ To this point, the United States directs our attention to the overwhelming support for IAC waivers throughout the federal circuit courts of appeals. As the United States' argument goes, these decisions make up the applicable "federal substantive law" on the issue that E–435 at-

20. 28 C.F.R. § 77.1(b).

21. *Directv, Inc. v. Treesh*, 290 S.W.3d 638, 641 (Ky.2009).

22. *See, e.g., Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 120, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) ("Legislative history is problematic even when the attempt is to draw inferences from the intent of duly appointed committees of the Congress.").

23. *Id.* (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)).

24. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

25. *Id.* at 438, 102 S.Ct. 2515 (Brennan, J., concurring in the judgment).

26. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).

27. *Id.* at 230–31, 67 S.Ct. 1146. In this particular case, the perplexity is increased by the fact that the Executive Branch, through the Office of Attorney General, is attempting to dictate to the Judicial Branch the standards for which attorneys, *i.e.*, officers of the courts, should uphold. The judiciary is autonomous with regard to the standards required of its officers. *See Theard v. United States*, 354 U.S. 278, 281, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957) ("The two judicial systems of courts, the state judicatures and the federal judiciary, have autonomous control over the conduct of their officers, among whom, in the present context, lawyers are included. The court's control over a lawyer's professional life derives from his relation to the responsibilities of a court.").

28. *See Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988).

tempts to alter erroneously. We concede that federal jurisprudential support for the waivers at issue here is nearly unanimous. Our research indicates that every federal circuit to consider the validity of an IAC waiver—ten out of twelve—has explicitly permitted defendants to plead guilty and waive collateral review, including IAC.[29] Undoubtedly, this case law is substantial and persuasive, *if* we were deciding, on its merits, whether a defendant could waive an IAC claim. But we are not deciding that issue. The obligations of *attorneys* are the real focus of this appeal. The KBA Ethics Committee, in any event, is without jurisdiction to issue opinions on such questions of law.[30] So this Court's review of an IAC waiver's validity in the context of a plea agreement waits for another day.

## 1. E–435 does not Violate the Supremacy Clause Because it is an Ethical Rule Applicable to the United States Under § 530B.

To date, there is a paucity of decisions interpreting § 530B and its associated regulations. Of course, the United States primarily cites federal decisions holding government attorneys are not subject to particular state ethics rules.[31] These decisions are minimally persuasive because the ethics rules at issue were substantially different than E–435. They dealt with ethics rules that attempted to create new procedural requirements rather than focusing on attorneys' ethical conduct.

Our research produces no case from a sister state's highest court and only one case from a federal court finding, despite § 530B, a state ethics rule applicable.[32] In *United States v. Colorado Supreme Court*,[33] the Tenth Circuit faced the

---

**29.** *See United States v. Djelevic*, 161 F.3d 104, 106–07 (2d Cir.1998); *United States v. Lemaster*, 403 F.3d 216, 220 (4th Cir.2005); *United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994); *Davila v. United States*, 258 F.3d 448 (6th Cir.2001); *Jones v. United States*, 167 F.3d 1142, 1145 (7th Cir.1999); *DeRoo v. United States*, 223 F.3d 919, 924 (8th Cir. 2000); *Washington v. Lampert*, 422 F.3d 864, 869–71 (9th Cir.2005); *United States v. Cockerham*, 237 F.3d 1179, 1183 (10th Cir.2001).

**30.** *See* Kentucky Bar Ass'n Ethics Op. E–297 (1984).

**31.** *See, e.g., Stern v. United States Dist. Ct.*, 214 F.3d 4, 20 (1st Cir.2000) (reviewing local rule 3.8(f), requiring prosecutors get prior judicial approval before subpoenaing an attorney in a grand jury proceeding and holding it was "more than an ethical standard"; instead, "[i]t add[ed] a novel procedural step ... and ... ordain[ed] that the hearing be conducted with new substantive standards in mind."). Ironically, this same rule—with alterations—was dealt with in *Colorado Supreme Court*, discussed below.

**32.** Some courts have, however, acknowledged the growing trend of state court ethics opinions and the complications they may present. These decisions arose in the context of a defendant's claim of IAC following a plea agreement that included a waiver of such claims. The Courts acknowledged possible ethics concerns, but ultimately decided the cases on alternate grounds. *See United States v. DeLuca*, No. 08–108, 2012 WL 5902555 (E.D.Pa. Nov. 26, 2012), available at: https://www. paed.uscourts.gov/documents/opinions/12d 1097p.pdf; *Watson v. United States*, 682 F.3d 740, 744 (8th Cir.2012); *United States v. Stevens*, 813 F.Supp.2d 758, 770 (W.D.Va.2011) (distinguishing Virginia ethics opinion by finding it only prohibited defense counsel from advising defendant to *accept* an IAC waiver, rather than advising the defendant generally about the waiver). Additionally, the Supreme Court of Missouri has not followed its ethics opinion. *See Cooper v. State*, 356 S.W.3d 148, 153–57 (Mo.2011).

**33.** 189 F.3d 1281 (10th Cir.1999).

question of whether Colorado Rules of Professional Conduct 3.8(f), which placed restrictions on prosecutors subpoenaing attorneys to give information about a past or present client, applied to federal prosecutors under § 530B. In short, the case turned on "whether the version of Rule 3.8 before [the court was] one of those normative legal standards that guides the conduct of an attorney."[34] This determination, in the Tenth Circuit's estimation, required the review of three factors: (1) "a rule of professional conduct would bar conduct recognized by consensus within the profession as inappropriate"; (2) "a rule of professional conduct is like a commandment dealing with morals and principles" and, to this end, "can often be quite vague in its nature, while by contrast the procedural or substantive law, the purposes of which are to direct a cause of action through the courts, cannot afford such vagueness"; and (3) "a rule of ethics is directed at the attorney herself."[35] Applying these factors to Colorado's Rule 3.8(f), the court found it was clearly a rule of ethics, not seeking to abrogate federal substantive or procedural law and, as a result, applied to federal prosecutors through § 530B.[36]

The Tenth Circuit's reasoning is illuminating and persuasive for our review of E-435 in light of § 530B's language. We believe E-435 meets the criteria supplied by the Tenth Circuit. Among state bar associations, there is a growing consensus that the use of IAC waivers in plea agreements is unethical behavior. As we write, twelve states have ruled IAC waivers in plea agreements unethical.[37] Two states disagree, although both recognize ethical concerns with the practice.[38] No other states have considered the issue. The American Bar Association has issued a resolution declaring its opposition to IAC waivers;[39] and the National Association of Criminal Defense Lawyers has issued a formal opinion declaring it unethical for defense lawyers to participate in such plea agreements.[40]

Second, E-435 is written in commandment form. The prohibition on use of IAC waivers is unequivocal. The Tenth Circuit noted ethics rules are often drafted in vague form in order to be broad enough to cover the various aspects of lawyer conduct. While E-435 is perhaps not as vague as other ethics rules, we do not find this dispositive. We will not hold it against E-435 that its focus is on a specific form of attorney conduct.

Finally, E-435 is narrowly tailored to address only attorney conduct. As the Tenth Circuit highlighted, "when a rule of

**34.** *Id.* at 1285.

**35.** *Id.* at 1287–88.

**36.** *Id.* at 1288–89.

**37.** Alabama Ethics Op. RO 2011–02; Prof. Ethics of the Florida Bar Op. 12–1 (June 22, 2012); Kentucky Bar Ass'n Ethics Op. E–435 (2012); Advisory Comm. of the Sup.Ct. of Mo. Formal Op. 126; State Bar of Nv. Formal Op. 48 (Oct. 27, 2011); N.C. Eth. Op. RPC 129 (Jan. 15, 1993); Oh. Adv. Op. 2001–6 (Ohio Bd.Com.Griev.Disp.), 2001 WL 1635553 (Dec. 7, 2001); Pennsylvania Bar Ass'n Legal Ethics & Prof. Resp. Comm. Formal Op. 2014–

100; Tenn. Op. 94–A–549 (1995); Ut. Eth. Op. 13–04 (Utah St.Bar.), 2013 WL 7393112 (Sept. 30, 2013); Vermont Bar Ass'n Advisory Ethics Op. 95–04 (1995); Virginia St. Bar Legal Ethics Op. 1857 (July 21, 2011).

**38.** State Bar of Arizona Ethics Op. 95–08 (Sept. 6, 1991); Texas Prof. Ethics Comm. Op. 571 (May 2006).

**39.** Am. Bar Ass'n Resolution 113E (Aug. 12–13, 2013).

**40.** Nat. Ass'n of Criminal Defense Lawyers Ethics Advisory Comm., Formal Op. 12–02 (Oct. 2012).

professional conduct is violated, members of the profession would agree that the violating attorney ought to be held personally accountable; whereas[,] when a procedural or substantive rule is violated, any negative effect would be directed primarily at the progress of the claim itself." [41] The United States may argue that E–435 affects the progress of the conviction but we disagree. A waiver of IAC is the right of the *defendant,* and nothing in E–435 limits the defendant's freedom of choice or control over his defense.

■■■ In our view, E–435 survives scrutiny under § 530B and the Supremacy Clause because it is simply an ethical rule and does not affect federal substantive, procedural, or evidentiary law.[42] There is no subterfuge in E–435. It is not a procedural or substantive rule disguised as an ethics rule. E–435 also survives because,

as we mention below, there is no contrary federal law.

### 2. The United States' Supremacy Clause Challenge Fails Because There is no Federal Law Contrary to E–435.

■■■ To the extent the United States' argument can be characterized as asserting federal circuit case law binds this Court's interpretation of § 530B and its associated regulations or determination of the ethical validity of IAC waivers, it is meritless. Admittedly, state courts are charged "with a coordinate responsibility to enforce [federal] law according to their regular modes of procedure." [43] But this does not mean the Supremacy Clause mandates our interpretation of federal law must dovetail with that of federal courts, whether it is unanimous or otherwise.[44]

---

41. *Colorado Supreme Court,* 189 F.3d at 1288.

42. In fact, the United States Attorney General has issued a policy statement prohibiting the IAC waivers at issue here in a separate context, notably not at the point of an ethical bayonet. On January 31, 2012, Deputy Attorney General James M. Cole published a memorandum applicable to early disposition or "fast-track" programs dealing with criminal immigration cases. The programs provide prosecutors great discretion to handle the seemingly ever-growing immigration caseload. In the minimum requirements for a plea agreement outlined in the memorandum, "the defendant must enter into a written plea agreement that includes at least the following items[:] ... the defendant agrees to waive ... appeal and the opportunity to challenge his or her own conviction under 28 U.S.C. § 2255, *except on the issue of ineffective assistance of counsel* [.]" Memorandum from Deputy Attorney General James M. Cole, *Department Policy on Early Disposition or "Fast–Track" Programs* (January 31, 2012), available at http://www.justice.gov/dag/fast-track-program.pdf.

43. *Howlett by and through Howlett v. Rose,* 496 U.S. 356, 367, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990).

44. *See, e.g., Johnson v. Williams,* 568 U.S. ——, 133 S.Ct. 1088, 1098, 185 L.Ed.2d 105 (2013) ("[T]he views of the federal courts of appeals do not bind the California Supreme Court when it decides a federal constitutional question, and disagreeing with the lower federal courts is not the same as ignoring federal law."); *Lockhart v. Fretwell,* 506 U.S. 364, 376, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (Thomas, J., concurring) ("The Supremacy Clause demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation."); *Cook v. Popplewell,* 394 S.W.3d 323, 346 (Ky.2011) ("We, of course, look to the Sixth Circuit with a great deal of respect, but as the Court of Appeals noted, we are not bound by Sixth Circuit precedent."); *Commonwealth Nat. Res. & Environ. Protection Cab. v. Kentec Coal Co.,* 177 S.W.3d 718, 725 (Ky.2005). For further discussion of state courts' treatment of federal law, see Colin E. Wrabley, *Applying Federal Court of Appeals' Precedent: Contrasting Approaches to Applying Court of Appeals' Federal Law Holdings and Erie State Law Predictions,* 3 Seton Hall Cir. Rev. 1 (2006).

State courts and federal courts exercise concurrent jurisdiction, and we are free to disagree. Of course, the approach taken by federal courts may be viewed as persuasive but it is not binding. Moreover, a fair amount of the case law cited by the United States was dated before the enactment of § 530B, so even if we were bound by federal interpretation, the cited cases would offer little help in light of more recent developments.[45]

We must admit it seems E–435, on its face, presents complicated Supremacy Clause concerns with regard to defense counsel. Under *Padilla v. Kentucky*, the Supreme Court reaffirmed that a defendant is entitled to effective assistance of counsel "[b]efore deciding whether to plead guilty";[46] and, in *Missouri v. Frye*, the Court held that a defense attorney "has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."[47] Surely, the waiver of collateral attack—including IAC claims—in exchange for a lesser sentence would be "favorable to the accused." Given precedent, we think the Supreme Court would find as such. While waiving the potential for an IAC claim does not carry with it the severe ramifications of deportation, it may foreclose the only remaining challenge to a conviction. Accordingly, it would be "quintessentially the duty of counsel to provide her client with available advice[.]"[48]

If that is true, an attorney subject to E–435 faces a dilemma. On the one hand—the federal hand—the attorney is required to disclose the terms of the offer to the defendant, which would presumably—as we described above—include some form of advice; on the other hand—the state hand—the attorney is prohibited from counseling the client on an IAC waiver. The attorney is left with two utterly unappealing "choices": act in a manner that may lead to bar discipline, perhaps endangering the attorney's license; or, act in a manner that is explicitly ineffective assistance of counsel, thereby violating the constitutional rights of the client. As a result, compliance with both would be a "physical impossibility";[49] and E–435 would be forced to yield because this situation would perhaps alter federal substantive law, con-

---

45. *See, e.g., Grievance Committee for Southern Dist. of New York v. Simels*, 48 F.3d 640 (2d Cir.1995). In addition, *Cavender v. U.S. Xpress Enterprises, Inc.*, 191 F.Supp.2d 962 (E.D.Tenn.2002), cited by the United States, relies extensively on *Simels*, despite being decided after § 530B's enactment. In fact, *Cavender* fails to mention § 530B at all, relying instead on the adoption of Tennessee's Code of Professional Conduct in its own local rules. As a result, the persuasive value is minimal at best.

46. 559 U.S. 356, 365, 373, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010) ("Before deciding whether to plead guilty, a defendant is entitled to the effective assistance of [ ] counsel."; "In sum, we have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel.") (internal quotation marks omitted).

47. *Frye*, 132 S.Ct. at 1408.

48. *Padilla*, 559 U.S. at 371, 130 S.Ct. 1473. Of course, under SCR 3.130–1.2(a), operating in conjunction with SCR 3.130–1.4(a)(2), an attorney is obligated to communicate plea terms to a criminal defendant and abide by the client's decision regarding whether to enter a plea. This requirement, however, operates "within the limits imposed by law and the lawyer's professional obligations." SCR 3.130–1.2 Cmt. 1. Accordingly, the ethical requirement to communicate plea terms to a criminal defendant would cede to E–435.

49. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

trary not only to § 530B, but to constitutional principles as well. Of course, this "physical impossibility" only arises if the prosecution offers a plea agreement with an IAC-waiver provision. We know of no federal law or constitutional principle that mandates defense counsel, of the attorney's own accord, to counsel on every potential plea-agreement term or to offer those terms to the prosecution. As we mention below, there is no constitutional or statutory right to a plea agreement, so there can be no such right to any specific plea-agreement provision.

 Moreover, the Sixth Amendment requires more than simple disclosure of plea agreement terms to qualify as "effective." Conflict-free counsel is also demanded.[50] The majority of jurisprudence surrounding counsel operating with a conflict focuses on representing multiple defendants or successive representation.[51] Admittedly, the type of personal conflict presented here with an attorney forced to advise a client on the attorney's own conduct may fall short of the conflict presented with an attorney essentially attempting to serve two masters. That said, a conflict exists; and one can easily foresee a serious impact on a defendant's access to effective assistance. The special nature of an attorney's relationship with a client only emphasizes the impact of this conflict: "There are few of the business relations of life involving a higher trust and confidence than that of attorney and client, or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice[.]"[52]

 Given the pervasiveness of plea bargaining in our modern criminal justice system, an attorney's personal conflict that affects the terms of the plea agreement could, of course, be highly prejudicial.[53] Indeed, counsel's performance complicated by possible personal conflict may fall "below an objective standard of reasonableness."[54] Perhaps because of the attorney's advice, there may exist a "reasonable probability that[ ] but for counsel's unprofessional errors[ ] the result of the proceeding would have been different."[55] The conflict, the extent of which often will not be evident until postconviction, may have prompted the defendant to take rational action other than entering a plea.[56]

---

**50.** *See, e.g., Holloway v. Arkansas,* 435 U.S. 475, 480–90, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Mickens v. Taylor,* 535 U.S. 162, 179, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (Kennedy, J., concurring) ("The Sixth Amendment protects the defendant against an ineffective attorney, as well as a conflicted one."); *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest.").

**51.** *See, e.g., Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

**52.** *Stockton v. Ford,* 52 U.S. (11 How.) 232, 247, 13 L.Ed. 676 (1850).

**53.** "Anything less [than effective assistance of counsel] might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.' " *Frye,* 132 S.Ct. at 1408 (quoting *Massiah v. United States,* 377 U.S. 201, 204, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)).

**54.** *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**55.** *Id.* at 694, 104 S.Ct. 2052.

**56.** For example, the American Bar Association and National Association of Criminal Defense Lawyers argue that it is common for innocent defendants to plead guilty. In fact, "the incentives to bargain are powerful enough to force even an innocent defendant to falsely confess guilt in hopes of leniency

■ Ethics opinions and American Bar Association standards "are guides to determining what is reasonable" and "may be valuable measures of the prevailing professional norms of effective representation, especially as these standards have been adapted to deal with the intersection of modern criminal prosecutions[.]"[57] The Supreme Court has yet to answer whether the Sixth Amendment prohibits an attorney from advising a defendant on waiving IAC, but "[t]he weight of prevailing professional norms supports the view"[58] articulated by E–435.

■ To be blunt, federal law simply does not, at this juncture, operate contrary to E–435; and E–435 appears to supply a needed prophylaxis in a situation that is murky for both defendants and defense counsel. At most, rather than oppose federal law, the application of E–435 highlights the emerging debate over what has been termed "the constitutionalization of the plea-bargaining process";[59] perhaps E–435 fills a gap in federal constitutional law, as the Supreme Court contemplated in *Nix v. Whiteside*.[60]

The United States' Supremacy Clause argument likewise fails because there is no "Law of the United States" mandating the terms a prosecutor must offer in a plea bargain.[61] Generally speaking, the volumi-

---

and in fear of reprisal." Am. Bar Ass'n Resolution 113E (quoting Lucian E. Dervan, *Bargained Justice: Plea Bargaining's Innocence Problem and the Brady Safety–Valve*, 2012 Utah L.Rev. 51, 56 (2012)). The potential prejudice arising from such plea agreements may be higher as a result of the thumb on the scale in favor of actually entering a plea agreement.

57. *Padilla*, 559 U.S. at 366–67, 130 S.Ct. 1473 (internal citations and quotation marks omitted).

58. *Id.* at 367, 130 S.Ct. 1473.

59. *See Frye*, 132 S.Ct. at 1412–14 (Scalia, J., dissenting) ("[I]t does present the necessity of confronting the serious difficulties that will be created by constitutionalization of the plea-bargaining process. It will not do simply to announce that they will be solved in the sweet by-and-by."); *Lafler v. Cooper*, — U.S. —, 132 S.Ct. 1376, 1391–92, 182 L.Ed.2d 398 (2012) (Scalia, J., dissenting) ("[T]he Court today opens a whole new field of constitutionalized criminal procedure: plea-bargaining law.... [I]t would be foolish to think that 'constitutional' rules governing *counsel's* behavior will not be followed by rules governing the *prosecution's* behavior in the plea-bargaining process[.]").

60. 475 U.S. 157, 165–66, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). The Supreme Court forecasted the issue presented by its recent constitutionalization in the plea-bargaining context and now E–435's application:

When examining attorney conduct, a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the state's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts. In some future case challenging attorney conduct in the course of a state-court trial, we may need to define with greater precision the weight to be given to recognized canons of ethics, the standards established by the state in statutes or professional codes, and the Sixth Amendment, in defining the proper scope and limits on that conduct.

61. We note there is some case law to suggest that because E–435 is an interpretation of the Kentucky Rules of Professional Conduct, and those rules have been adopted by the federal courts within Kentucky, *see* Joint Local Rules of Criminal Practice for the U.S. District Courts for the Eastern and Western Districts of Kentucky (LCrR) 57.3(c), E–435 is actually federal law and the Supremacy Clause does not apply. *See United States v. Klubock*, 832 F.2d 649, 651 (1st Cir.1987) ("[S]ince its adoption by the District Court, PF 15 can no longer be considered state law, because by its incorporation into the local rules, PF 15 has become *federal* law."). We reject its application here because, while the federal courts within Kentucky have adopted our Rules of Professional Conduct, E–435 is merely an ad-

nous case law cited by the United States focuses on the *defendant's* right to waive an IAC claim when entering into a plea agreement. The prosecutor's obligation in the negotiation goes unmentioned. We know of no constitutional requirement, outside of simple fair play, applying to the prosecutor's role in the plea bargain process. In fact, it is a matter of prosecutorial grace that a defendant is even *offered* a plea bargain, terms aside.[62] With no right to be offered a plea agreement, a defendant is not vested with a right requiring the inclusion of any particular terms in a plea agreement.[63]

We are aware that Federal Rules of Criminal Procedure 11(b)(N) requires a trial court "inform the defendant of, and determine that the defendant understands . . . the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence." On its face, this indicates that prosecutors *may* offer a defendant a plea agreement containing a provision waiving the right to attack the conviction collaterally, ostensibly including on IAC grounds. We emphasize "may" because while Rule 11 contemplates the occurrence of a provision like at issue here, there is no requirement that a plea include it; rather, Rule 11 operates as a safeguard for the defendant in the case a prosecutor decides to offer the provision. This lack of directive for a prosecutor makes sense in the scheme of plea bargaining because the United States desires—even needs—the ability to use its bargaining chips in whatever manner reaches a just result for the government, the defendant, and the victim.[64]

 On the other hand, this lack of directive effectively eliminates the United States' Supremacy Clause argument.[65] E–

---

visory opinion and does not become binding in any way, save the review we are currently undertaking.

**62.** *See Weatherford v. Bursey*, 429 U.S. 545, 561, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) ("[T]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial. It is a novel argument that constitutional rights are infringed by trying the defendant rather than accepting his plea of guilty.").

**63.** This says nothing about a defendant's right to waive an IAC waiver. The question of whether a defendant may waive something the defendant is offered is not the same as whether a defendant has a right to have the offer in the first place.

**64.** As an aside, our review of the United States Attorneys' Manual for the mention of terms required for a plea agreement was fruitless. Instead, the manual describes considerations to be weighed when offering a plea and various specific plea situations. *See* Dept. of Justice, United States Attorneys' Manual §§ 9–16.001 to 9–16.500, 9–27.330 to 9–27.450.

**65.** Similarly, the United States' attempt to paint E–435 as potentially creating the lamented prison of constitutional privileges is unavailing. Because the defendant enjoys no constitutional right to receive the *best* "deal" in a plea bargain, limiting the use of IAC waivers as a bargaining chip does not restrict a defendant's constitutional rights. Furthermore, a defendant retains the right to "conduct his own defense [perhaps] ultimately to his own detriment," *Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), so he is free to choose to waive IAC of his own volition. Restricting the conduct of the attorneys who are tasked with fairly operating the justice system in no way denies the defendant "the exercise of his free choice . . . to dispense with some of these [constitutional] safeguards[.]" *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942). We are not, through our treatment of E–435, "imprison[ing] a [defendant] in his privileges and call[ing] it the Constitution." *Id.* at 280, 63 S.Ct. 236. After all, the Sixth Amendment grants the defendant "personally the right to make his defense" and "an assistant, however expert, is still an assistant." *Faretta*, 422 U.S. at 819–20, 95 S.Ct. 2525. Contrary to the assertion

435 prohibits prosecutors from offering an IAC-waiver provision, which incidentally eliminates the ethical and constitutional quagmire discussed above. Because there is no federal law or constitutional principle contrary to E–435's proclamation, we are unable to discern how the Supremacy Clause prohibits this Court from fulfilling its obligation to embrace E–435 if its declaration comports with our Rules of Professional Conduct. And, again, the case law cited by the United States fails to address the duties of the prosecutor, so we fail to see how E–435 would alter federal substantive law with regard to prosecutors.

Given the background and context surrounding § 530B's enactment, it seems clear this is not the situation Congress was attempting to avoid; instead, it makes more sense that E–435's current operation was what Congress *sought*. Because E–435 does not operate contrary to existing federal law, the United States' Supremacy Clause challenge fails.

## B. E–435 Correctly Articulates the Ethical Concerns Associated with Allowing IAC Waivers in Plea Agreements.

Having found E–435 is not precluded by the Supremacy Clause, we now turn to its merits. As we mentioned previously, E–

435 does not express a novel position. E–435 aligns with the vast majority of state ethics decisions, and the two divergent states are not as differing in their views as the United States attempts to argue.[66] The soundness of E–435's reasoning aside, as former Justice Robert Jackson famously remarked, "the mere fact that a path is a beaten one is a persuasive reason for following it." [67] We choose the beaten path today.

### 1. Counseling a Defendant on an IAC Waiver Presents Both an Unwaivable Conflict of Interest and Concerns With Limiting Malpractice Liability.

### a. Conflict of interest.

■ The United States challenges E–435's proscription of defense counsel's providing advice on IAC waivers in plea agreements. The United States' arguments are numerous but lacking. Primarily, the United States argues any personal conflict posed by the presence of an IAC waiver provision ordinarily will not propose a "significant risk" because of the attorney's concomitant duty to advocate zealously for the client; E–435 presents an improper presumption that attorneys provide ineffective assistance; collateral attack is still available to the defendant; and an IAC waiver is not analogous to limiting malpractice liability. Additionally, the

by the United States, we do not find E–435 limits a defendant's Sixth Amendment rights.

**66.** For example, Arizona's ethics opinion focuses *solely* on the application of –1.8(h), the prohibition of an attorney entering an agreement limiting exposure to liability for malpractice. There is no mention of a potential conflict of interest for defense counsel. Moreover, Arizona has case law expressing a strong policy of disallowing *any* waiver of appellate rights by a defendant. *State v. Ethington*, 121 Ariz. 572, 592 P.2d 768, 769–70 (1979) ("We hold that the right to appeal is *not negotiable in plea bargaining*, and that as

a matter of public policy a defendant will be permitted to bring a timely appeal from a conviction notwithstanding an agreement not to appeal.") (emphasis added). So, Arizona's position on the waiver of IAC claims is rather ambiguous and does not clearly support the United States' position.

**67.** Robert H. Jackson, *Full Faith and Credit— The Lawyer's Clause of the Constitution*, 45 Colum.L.Rev. 1 (1945), available at: http://www.roberthjackson.org/the-man/speeches-articles/speeches/speechesby-robert-h-jackson/full-faith-and-credit/.

United States believes whether a conflict exists should be decided on a case-by-case basis with the attorney making that determination.

We begin our analysis with a simple observation about the nature of our Rules of Professional Conduct. Merely because a practice, arguably unethical in nature, does not arise in every client's representation does not mean an ethical rule is not needed. Ethical rules are designed to eliminate the possibility of an ethical violation, no matter how unlikely the targeted conduct may be. Simply put, it is not sufficient to say, as the United States attempts to argue, that "ordinarily" an attorney's personal interest will not create a significant risk that a client's representation will be materially limited. This leaves open the possibility that ethical violations may occur and clients' interests may be compromised. Instead of *reactive,* our ethics rules are intended to be *proactive* and operate preventively.

In that vein, SCR 3.130–1.7 deals with concurrent conflicts of interest, attempting to prevent situations from arising where there is a "substantial risk" representation of the client will be "materially limited" because of the lawyer's "personal interest." The goal of SCR 3.130–1.7 is to lessen the possibility of a "lawyer's own interests ... hav[ing] an adverse effect on [the] representation of a client."[68] When defense counsel is forced, through the introduction of an IAC waiver in a plea agreement, to advise a client on the attorney's own conduct, a personal interest certainly exists. An IAC claim is time consuming for an attorney,[69] may tarnish the attorney's professional reputation, may subject the attorney to discipline by the bar or courts, and may even have serious financial consequences for the attorney's practice.[70] In fact, SCR 3.130–1.7 Cmt. 10 contemplates just such a situation: "[I]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice."[71] Providing advice on whether it is appropriate to waive collateral attack plainly involves, at the very least, an internal review of the probity of the attorney's own conduct.

Admittedly, SCR 3.130–1.7 contemplates that a conflict may be waivable by the client if various requirements are met: (1) "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client"; (2) "the representation is not prohibited by law"; (3) "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal"; and

---

68. SCR 3.130–1.7 Cmt. 10.

69. Listed separately here, time-consumption and financial loss often go hand-in-hand. As the Utah Ethics Advisory Committee noted, "[h]aving to respond in some fashion, or having to prepare, appear and testify at a[n IAC hearing] could involve very substantial time on the part of the attorney, at considerable loss of billable hours." Ut. Eth. Op. 13–04 at *5. Additionally, an attorney "may feel the need to put money out of pocket to hire counsel to represent her in such a proceeding." *Id.*

70. *See* Mary Alice Robbins, *Solo Seeks Mandamus to Reverse Judge's Ineffective–Assistance Finding,* Texas Lawyer (July 21, 2014, 11:00 AM), http://www.texaslawyer.com/id=1202424166826/Solo–Seeks–Mandamus–to–Reverse–Judges–Ineffective–Assistance–Finding?slreturn=20140624102610 (covering attorney who was found ineffective in civil proceeding and then removed from court-appointed cases, which were the focus of her practice and primary source of income—approximately $77,000 a year).

71. SCR 3.130–1.7 Cmt. 1.

(4) "each affected client gives informed consent, confirmed in writing." [72]

This conflict is unwaivable, however, because the conflict of interest is not local; that is, the conflict is not limited to the single attorney representing the defendant. SCR 3.130–1.7 allows for independent counsel to step in when a conflict of interest is present. This procedure attempts to alleviate the impact of the conflict because, presumably, the independent counsel will not share the conflict. The United States concedes that an IAC claim challenging the knowingness or voluntariness of the plea entry would be allowed to proceed, notwithstanding the presence of a waiver provision.[73] Ostensibly, independent counsel would provide advice for the defendant on the IAC waiver and, in doing so, would necessarily discuss independent counsel's own performance. A defendant, in theory, could then later bring an IAC claim attacking the entry of the plea because the independent counsel was ineffective. The conflict persists. Independent counsel does not alleviate its pervasiveness.[74] Moreover, as we will explain below, there is psychological evidence indicating that individuals are subject to "bi-

ases" that make difficult, in a situation such as presented here, effectively determining whether competent and diligent representation is possible.

The United States next tries to claim that E–435 operates on a presumption that attorneys provide ineffective assistance. This argument is meritless on several grounds. We have the utmost confidence in the ethical conduct of the members of the Kentucky bar. That confidence, however, does not preclude the need for ethics rules to guide them.

We do not dispute that the *Strickland* analysis applies to plea bargaining. And, furthermore, we concede that *Strickland* calls for a presumption of effective assistance. But arguing E–435 presumes ineffective assistance is misguided. The Supreme Court has acknowledged the "murk[y] pre-trial context" where the "likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict" and "rare [is the] attorney who will be fortunate enough to learn the entire truth from [her] own client, much less be fully apprised before trial of what each of the Government's witnesses will say on

---

**72.** SCR 3.130–1.7(2)(b)(1)–(4).

**73.** The United States argues it needs these waivers to ensure finality of conviction. Their argument involves a curious method of ensuring finality. If we were to accept the United States' position, IAC claims would still proceed, except with an additional step: the initial determination of whether the IAC went to the actual entry of the plea, *i.e.*, was the plea entered knowingly and voluntarily? The United States' position does not eliminate IAC claims, as we are sure is their aim but, rather, convolutes the process because the defendant would surely be entitled to "careful consideration and plenary processing of his claim, including full opportunity for presentation of the relevant facts." *Blackledge v. Allison*, 431 U.S. 63, 82, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) (alteration omitted). Furthermore, the

Supreme Court has noted an IAC claim regarding a plea agreement has an inherent deterrent: the possibility of a less favorable result. *See Padilla*, 559 U.S. at 371–72, 130 S.Ct. 1473. If the defendant is victorious, the plea is vacated and the defendant may face trial, which, of course, may lead to any number of less desirable results. Practically speaking, finality is not often in doubt because ineffective assistance of counsel claims are rarely victorious. The burden carried by the defendant is quite high. In light of these factors, we do not find the United States' finality concerns merit heavy discussion.

**74.** The Utah ethics opinion described this as a "daisy chain of conflict lawyers, each passing upon the soundness of the judgment of the next preceding one." Ut. Eth. Op. 13–04 at *7.

the stand." [75] No presumption of ineffectiveness is required to acknowledge the "imponderables" [76] lurking during plea bargaining. E–435 simply attempts to provide a clear understanding of appropriate conduct in an often cloudy situation. In turn, the interests of both the defendant and the overall criminal justice system are protected.

In highlighting the lack of a presumption of ineffectiveness, we cannot emphasize enough the forward-looking purpose of our ethics rules. Again, we do not seek to be merely reactionary in our duty to regulate the legal profession. To this end, a conflict exists when there is a "substantial risk" of negatively impacting the client's representation. This is true whether or not the "feared eventuality ever materializes." [77] This admittedly differs somewhat from the *Strickland* standard. But we see no reason why this indicates a presumption of ineffectiveness; rather, our regulation in this area indicates our keen awareness of the potential for confusion for the effective and ineffective lawyer alike.

Moreover, psychological studies have "uncovered psychological biases that make it extremely difficult for professionals, even those who are acting in good faith and whose only limitation is unconscious, to appreciate the deleterious consequences of conflicts of interest." [78] Sure, the "venal lawyer may, from time to time, intentionally seek to obscure evidence of a conflict of interest, or the harmful effects that a conflict had during representation"; but "psychological research demonstrates that most lawyers—even those who are acting with the best intentions—are unable consciously to identify many conflicts that exist or to appreciate the corrosive effects that such conflicts may have on decision[-]making." [79]

Empirical data suggests it unwise to force an attorney to determine whether her own provided assistance was effective or not.[80] Recently, the field of behavioral economics has been applied to ethical decision-making. This body of research has fostered what is known as "bounded ethicality," [81] essentially meaning humans are "limited during the process of making ethical decisions[.]" [82]

Conflicts of interest, especially the personal conflict in question, provide an example of the "dual-process model" of decision-

---

**75.** *Wheat v. United States,* 486 U.S. 153, 162–63, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

**76.** *Id.* at 163, 108 S.Ct. 1692.

**77.** Tigran W. Eldred, *The Psychology of Conflicts of Interest in Criminal Cases,* 58 U. Kan. L.Rev. 43, 54 (2009).

**78.** *Id.* at 48

**79.** *Id.*

**80.** Contrary to this notion, Texas, in its review of IAC waivers, adopted the view that attorneys were able objectively to review their conduct and provide adequate counsel to defendants. We reject this position, despite support in Supreme Court precedent for the idea that defense counsel can be trusted to acknowledge and disclose any potential conflict of interest because empirical data suggests reviewing one's own conduct is fraught with unconscious errors.

**81.** This method of thought stems from the use of bounded rationality to address a particular type of ethical decision-making originated by Mahzarin R. Banaji and R. Bhaskar in their work, *Implicit Stereotypes and Memory: The Bounded Rationality of Social Beliefs, in* Memory, Brain, and Belief p. 139–75 (Daniel L. Shacter & Elaine Scarry, eds., 2000). *See* Dolly Chugh et al., *Bounded Ethicality as a Psychological Barrier to Recognizing Conflicts of Interest, in* Conflicts of Interest: Challenges and Solutions in Business, Law, Medicine, and Public Policy p. 74–95 (Don A. Moore et al. eds., 1995).

**82.** Eldred, *supra* note 77, at 66.

making, where "the human mind processes self-interest automatically, while decisions about professional responsibility are processed by the controlled mode of analytical thought."[83] The presence of a conflict of interest illustrates the necessity of E–435:

> In most instances, automatic and controlled processes work together to make decisions. But when a conflict of interest is present, and self-interest and professional responsibility collide, *the decision often results in an automatic preference for self-interest.* This results in a critical observation: while the decision-maker will believe that the decision comes from rational deliberation where all competing concerns are considered and weighed, in actuality the automatic bias toward self-interest will often create an error in judgment that favors self-interest, *automatically and without conscious awareness.* In other words, the decision-maker will rationalize behavior as consistent with ethical norms, even when in actuality the decision preferences self-interest.[84]

As a result, even an attorney acting in good faith, diligently attempting to provide the best advice for a client, is at risk of unconsciously painting an ethical gloss over his or her decision.[85] In fact, "the decision-maker uses rational thought to search for arguments that support an already-made judgment through moral intuition";[86] and, furthermore, studies have indicated "people tend to overestimate their ability to act ethically, both prospectively when asked to consider how ethical they will be in the future and in hindsight when asked to evaluate how ethical they have been in the past."[87] Perhaps consistent with intuition, "[r]esearch demonstrates that situations where discretion is permitted, and bright lines do not exist, are where psychological biases that skew judgment are most likely to operate."[88] E–435 is both useful and necessary.

### b. Limitation on malpractice liability.

An additional ground on which E–435 rests is SCR 3.130–1.8(h), the prohibition on "mak[ing] an agreement prospectively limiting the lawyer's liability to a client for malpractice[.]" The United States challenges this basis as irrelevant and inapplicable to a waiver of IAC. Of course, we can agree with the United States to the extent that an IAC claim is not a claim for malpractice. But that is where our agreement ends.

▮▮▮▮▮ The reason advising a client to waive an IAC claim in a plea agreement

---

**83.** *Id.* at 68.

**84.** Eldred, *supra* note 77, at 68–69 (emphasis added).

**85.** *See* Leonard E. Gross, *Are Differences Among the Attorney Conflict of Interest Rules Consistent with Principles of Behavioral Economics?*, 19 Geo. J. Legal Ethics 111 (2006); Don A. Moore & George Loewenstein, *Self-interest, Automacity, and the Psychology of Conflict of Interest*, 17 Soc. Just. Res. 189 (2004).

**86.** Eldred, *supra* note 77, at 70 (internal quotation marks omitted); *see also*, Roger C. Cramton & Lisa K. Udell, *State Ethics Rules and Federal Prosecutors: the Controversies Over the Anti–Contact and Subpoena Rules*, 53 U. Pitt. L.Rev. 291, 317 (1992) ("There is strong evidence that lawyers when they regulate themselves are inclined to take positions that favor the use of lawyers and enhance their authority and prestige.").

**87.** *Id.* at 71. "When looking prospectively, people tend to focus on what 'should' happen. In contrast, during the phase when action itself takes place, what people 'want' tends to dominate. Looking backward, people tend to erroneously identify conduct that should have dominated the decision-making process, when in fact it was people's wants that dominated behavior." *Id.* (internal citations omitted).

**88.** *Id.* at 72.

limits an attorney's malpractice liability is indirect, yet straightforward. In Kentucky, to claim malpractice in a criminal case, just the same as a civil case, a defendant must show proximate cause.[89] In this context, proximate cause involves a "but for" determination, *i.e.*, but for the attorney's malfeasance, the client—read: defendant—would not have been convicted.[90] Admittedly, in Kentucky, the viability of a malpractice claim following a guilty plea is in doubt. Saving a lengthy discussion of our malpractice landscape, suffice it to say that without having his conviction overturned, a defendant's attempt at proving proximate cause becomes extraordinarily difficult, virtually impossible.

Plainly then, advising a defendant to waive a potential IAC claim—an acknowledged method of obtaining post-conviction relief—would limit the potential for malpractice liability. An attorney should not be allowed to do indirectly that which the attorney is prohibited from doing directly.

The language of our ethics rules aside, public policy supports our conclusion that advising on an IAC waiver in a plea agreement is prohibited under –1.8(h). Criminal defendants, of course, seldom bring malpractice actions. Instead, the usual course of action is via an action under Kentucky Rules of Criminal Procedure (RCr) 11.42 or, federally speaking, a writ of habeas corpus under 28 U.S.C. § 2255. "[C]riminal defendants should not suffer from lesser protections simply because they usually seek habeas corpus relief rather than malpractice damage[s.]"[91]

For the foregoing reasons, E–435 is appropriate as applied to defense counsel.

## 2. A Prosecutor Inserting an IAC Waiver into a Plea Agreement Induces a Fellow Attorney to Violate the Rules of Professional Conduct.

██ Finally, the United States challenges E–435's proscription of prosecutors embedding an IAC waiver in a defendant's plea agreement. The United States claims a prosecutor, without knowing of specific ineffective performance by defense coun-

**89.** *See Ray v. Stone*, 952 S.W.2d 220 (Ky.App. 1997) (discussing requirement that defendant prove innocence before bringing malpractice action); *see also* David J. Leibson, 13 Ky. Prac. Tort Law § 10:18.

**90.** It is important to note here that this Court has yet to rule explicitly on the "innocence" requirement adopted in *Stone;* that is, the requirement that a criminal defendant either prove his actual innocence or his legal innocence-a jury would not have found him guilty beyond a reasonable doubt without the attorney's negligence. A substantial volume of ink has been spilled debating the merit of such a requirement, *see, e.g.,* Kevin Bennardo, Note, *A Defense Bar: The "Proof of Innocence" Requirement in Criminal Malpractice Claims,* 5 Ohio St. J.Crim. L. 341 (2007) (compiling cases and theories both in support and defense of requiring defendants prove some degree of innocence), but today is not the proper day for such a discussion. It is worth mentioning, however, that proving innocence in

some form is the majority position among the States. *See id.; see also* Justin D. Wear, Case Note, *Tort Law—Criminal Malpractice—Criminal Defendants Ability to sue his Defense Attorney for Legal Malpractice Gibson v. Trant,* 70 Tenn. L.Rev. 905 (2003). Furthermore, there is caselaw, including *Stone,* supporting the concept that a criminal malpractice action may not be sustained following a guilty plea—the logic for such a doctrine being that any negligence by the attorney cannot overcome the fact that the defendant's admitted criminality is the reason for his conviction and incarceration. Again, we need not decide these issues today; we mention them here in the sake of accuracy.

**91.** J. Peter Voloski, *Bargain for Justice of Face the Prison of Privileges? The Ethical Dilemma in Plea Bargain Waivers of Collateral Relief* 86 Temple L.Rev. 429, 447 (2014) (quoting Ariz. Eth. Op. 95–08 (1995) (dissenting opinion)) (compiling state bar opinions agreeing with this point) (internal quotation marks omitted).

sel, cannot *knowingly* induce a fellow attorney to violate ethical rules. We disagree.

Under our ethical rules, "[i]t is professional misconduct for a lawyer to: ... knowingly assist or induce another [attorney] to" "violate or attempt to violate the Rules of Professional Conduct[.]" [92] Providing context to the language, *knowing* is defined as "[h]aving or showing awareness or understanding"; [93] and *induce* is roughly defined as to "influence[ ] or persuade[ ]." [94] Prosecutors offering plea agreements with IAC waivers surely violate this rule.

Despite any notion of horse trading, plea agreements are often essentially contracts of adhesion. Indeed, in the context of appellate waivers, they have been labeled as such.[95] The plea agreement often comes with a take-it-or-leave-it tone. And defense counsel is forced to deal with the provision if offered. Because the prosecutor is aware of our ethical rules, we see little reason why offering a contract of adhesion that requires a fellow attorney to perform unethically in order to comply with other ethical or constitutional obligations would not be "influencing or persuading" a fellow attorney to violate our ethical rules. Contrary to the United States' assertion, it is not necessary that the prosecutor know defense counsel has been ineffective in order to satisfy the rule. Instead, the plain language of the rule indicates that what is required is for a prosecutor to understand his conduct will

result in a fellow attorney violating our ethical rules.

E–435 additionally found the United States plea-bargaining practice violated –3.8 of our ethical rules. As a result of their weighty role in our justice system, –3.8 places special responsibilities on prosecutors. E–435 holds the insertion of IAC waivers in plea agreements violates the "spirit" of –3.8 and prosecutors disregard their role as a "minister of justice" when using such waivers. In truth, prosecutors are expected to be more than "simply ... an advocate." [96] Demanding a defendant waive a potential IAC claim—or, worse, all collateral attack—may provide finality but at too high of a cost. A defendant's conviction is essentially unappealable as a result of the waiver in question. A prosecutor is charged with "see[ing] that the defendant is accorded procedural justice," [97] and we simply do not believe the use of IAC waivers lives up to that lofty expectation.

Accordingly, we affirm E–435 with respect to prosecutors.

### III. CONCLUSION.

We are duty-bound to regulate the legal profession within our borders. Today, we are proactive in that role. Attorneys practicing in this Commonwealth, whether state or federal, must comply with our ethics rules. Accordingly, either defense counsel or prosecutors inserting into plea agreements waivers of collateral attack,

---

**92.** SCR 3.130–8.4(a).

**93.** BLACK'S LAW DICT. (9th ed.2009).

**94.** Bryan A. Garner, Garner's Dict. of Legal Usage, p. 448 (3d ed.2011).

**95.** *See United States v. Mezzanatto*, 513 U.S. 196, 216, 115 S.Ct. 797, 130 L.Ed.2d 697

(1995) (Souter, J., dissenting); *United States v. Johnson*, 992 F.Supp. 437, 439–40 (D.C.Cir. 1997).

**96.** SCR 3.130–3.8 Cmt. 1.

**97.** *Id.*

including IAC, violates our Rules of Professional Conduct.

All sitting. All concur.